**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> PLAINTIFF, <br><br> V. <br><br> AMERICAN PATRIOT BRANDS, INC., URBAN PHARMS, LLC, DJ & S PROPERTY #1, LLC, TSL DISTRIBUTION, LLC, ROBERT Y. LEE, BRIAN L. PALLAS, AND J. BERNARD RICE, <br><br> DEFENDANTS, AND <br><br> PUERTO RICO ONE CORPORATION, CASTRO BUSINESS ENTERPRISES, LLC, AND LEGION ACCOUNTING SERVICES, INC. <br><br> RELIEF DEFENDANTS. | CIVIL NO. |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, United States Securities and Exchange Commission ("Commission" or "SEC"), for its Complaint and Demand for Jury Trial against Defendants American Patriot Brands, Inc. ("APB"), Urban Pharms, LLC ("Urban Pharms"), DJ & S Property #1, LLC ("DJ & S"), TSL Distribution, LLC ("TSL"), Robert Y. Lee ("Lee"), Brian L. Pallas ("Pallas"), and J. Bernard Rice ("Rice") (collectively, the "Defendants"), and Castro Business Enterprises, LLC ("CBE"), Puerto Rico One Corporation ("PR-One"), and Legion Accounting Services, Inc. ("Legion")

(collectively, the "Relief Defendants"), alleges as follows:

## SUMMARY OF ACTION

1.      This case involves a fraudulent securities offering in APB, a cannabis cultivation and distribution company.  From August 2016 through the present (the "Relevant Period"), APB's Chief Executive Officer Lee, Chief Operating Officer Pallas, and Chief Financial Officer Rice have solicited investments and raised over $30 million from more than 100 investors in the United States, including in this District, through a variety of material misrepresentations and omissions.

2.      As part of its offerings, APB urged investors to act quickly to invest before APB made its securities more widely available, an event APB claimed was imminent.  In fact, the SEC registration APB needed for widespread public trading was in jeopardy and was revoked in the midst of an offering.  APB told investors that it had multistate and worldwide operations when it had no operations outside of Oregon.

3.      Although APB produced only a small amount of sellable cannabis a year, it promoted itself as one of the largest cannabis farms in the country and provided wildly inflated financial information to support extremely high revenue projections.  To make the investment appear even more attractive, APB promised that investments would be secured by a lien on APB's cannabis farm, at times when the farm likely did not have enough equity to secure investments.

4.      APB's officers have siphoned off millions in investor funds to Relief Defendant PR-One, a company partly owned by Lee, and Relief Defendant CBE, a company APB does not control.  They have also used investment proceeds to enrich themselves through payments that, in some years, vastly exceeded the revenues APB generated from the sale of cannabis products.

5.      Having left existing investors with essentially worthless securities, APB is still actively marketing securities to prospective investors with the same false and misleading claims.

2

## DEFENDANTS

6.  **APB** is a Nevada corporation, formed in 2009, with its corporate headquarters in Newport Beach, California.  APB owns and operates subsidiary companies that farm and sell cannabis.

7.  **DJ & S** is an Oregon limited liability company with its principal place of business in Medford, Oregon and the owner of the real property and improvements constituting a cannabis farm (the "Oregon Farm").  APB owns and operates DJ & S.

8.  **Urban Pharms** is an Oregon limited liability company that operates the Oregon Farm.  APB owns and operates Urban Pharms.

9.  **TSL** is an Oregon limited liability company with its principal place of business in Portland, Oregon.  TSL sells cannabis from APB and other growers.  APB owns and operates TSL.

10. **Lee**, 58, is a resident of Newport Beach, California.  He is the Chief Executive Officer of APB and Chairman of its Board of Directors.

11. **Pallas**, 76, is a resident of Laguna Beach, California.  He is the Chief Operating Officer of APB, Urban Pharms, and TSL.  He is also a member of APB's Board of Directors.

12. **Rice**, 68, is a resident of Roswell, Georgia.  He was the Chief Financial Officer and Executive Vice President of Corporate Development for APB from at least February 2017 to 2019.

## RELIEF DEFENDANTS

13. **PR-One** is a Puerto Rican corporation with a principal place of business in San Juan, Puerto Rico.  Lee is the Chairman of the Board of PR-One.

14. **CBE**, formerly known as Castro Business Enterprises, Inc. and doing business as Castro Cash and Carry and NGX Military Store, is a Puerto Rican corporation with its principal place of business in San Juan, Puerto Rico.  Ricky Castro is CBE's president.

15.    **Legion** is a California corporation with its principal place of business in Yorba Linda, California.  Legion is owned by Rosalie Frances D'Amico, formerly known as Lee Patin, who serves as APB's controller.  APB uses a bank account in the name of Legion as an operating account.

## JURISDICTION AND VENUE

16.    This Court has subject matter jurisdiction over this action pursuant to Sections 20(b), 20(d)(1), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d)(1), and 77v(a)], and Sections 21(d) and 27(a) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78aa(a)].

17.    Venue is proper in this district under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)] because at least one of the fraudulent offerings was made almost exclusively to Puerto Rican residents, at least 47 of whom purchased, collectively, over $3.2 million worth of APB securities.

## THE FRAUDULENT OFFERINGS

18.    From 2016 through the present, APB has offered its securities for sale and represented that the funds would be used to pay for, among other things, the operation or expansion of Urban Pharms, DJ & S, and TSL (the "Subsidiaries").

19.    Some investors participated in the offerings by purchasing stock or options to buy stock in APB.  Other investors loaned APB funds pursuant to convertible promissory notes that granted investors the right to receive note payments in either APB stock or cash.  Other investors were offered the right to receive rent and a percentage of the sales from a field on the Oregon Farm called Garden #1 (the "Garden Units").

20.    The convertible promissory notes are securities because, among other things, they were:  (1) promoted as a way to raise funds for the operation and expansion of APB's business;

(2) sold to nearly 50 investors and promoted to hundreds more; (3) promoted by APB as investments, titled as "securities;" and (4) were unsecured or under-secured.  They are not subject to regulation by another federal agency.

21.    The Garden Units are securities because, among other things:  (1) investors' monies were pooled to acquire the ownership interest in Garden #1; (2) the investors share in the revenues of cannabis produced from Garden #1; and (3) the revenues and rent are derived from the efforts of APB and the Subsidiaries.

22.    To induce prospective investors to invest in APB, to induce existing investors to increase their investments, and to induce convertible promissory note holders to choose repayment in the form of APB stock, Lee, Rice, and Pallas, acting on behalf of APB and the Subsidiaries, made numerous misrepresentations and omissions.

**I.    The First Offering - 2016 through 2019**

23.    From 2016 through 2019, APB offered securities that generated approximately $20 million in investment funds from approximately 50 investors.

24.    Lee and Rice made numerous misrepresentations and omissions to investors, including investors identified below as Investors 1 through 6.  At the time the misrepresentations and omissions were made, Investors 1 through 6 had either not yet invested, held unexercised rights to convert their promissory notes to APB stock, or held unexercised options to purchase APB stock.

25.    To convince the First Offering investors that APB's securities were likely to produce significant returns, APB made multiple misrepresentations about APB's past revenues and, based on that false information, made revenue projections that were wholly unfounded.

26.    In March 2017, Rice emailed a presentation to a representative of prospective

Investor 1.  The presentation falsely stated that in 2016 APB had "achieved [w]holesale cannabis revenues of over $3.3 million and EBITDA [earnings before interest, taxes, depreciation, and amortization] of over $1 million."  In fact, APB had only achieved $330,905 of gross revenue and had a **negative** EBITDA of $9,606,543 for 2016.

27.    In the fall of 2017, Lee told prospective Investor 5 that APB executives had not taken salaries in the past and had agreed to be compensated exclusively in APB stock.  This statement was false.  The total monies APB paid to Lee, Rice, and Pallas in 2017 exceeded all of APB's revenues from the sale of cannabis products.

28.    On November 26, 2017, with just 36 days left in APB's fiscal year, Rice emailed a presentation to a representative of Investor 1.  The presentation projected that APB would achieve "annualized revenue of over $16 million and positive cash flow of over $5 million for fiscal year 2017."  To meet that projection, APB would have had to achieve revenues of $11.9 million in the next 36 days, almost 3 times the total revenues APB had achieved from January to November 2017.

29.    In April 2018, Lee used a presentation dated April 13, 2018, and updated on April 18, 2018, to promote the offering to prospective investors throughout the Caribbean.  The presentation falsely claimed that APB's 2017 revenues were $8.2 million, when APB's 2017 revenues were only $4.2 million, and falsely claimed that APB had raised $40 million from investors, when APB had not even raised $17 million.  The presentation also claimed that a famous retired United States Army General was APB's "Chief Humanitarian and Global Economic Advisor," when APB had previously claimed that the General resigned from the Company in 2016.

30.    With Rice's knowledge, on April 20, 2018, an APB employee emailed the April presentation to a representative of Investor 1 and to prospective Investor 2, who forwarded the

presentation to prospective Investor 3.  In addition, on July 2, 2018, with Rice's knowledge, an APB employee emailed the April presentation directly to prospective Investor 3.

31.    On January 9, 2019, Lee emailed another presentation to Investor 4.   The presentation projected that, in 2019, APB would achieve $128.5 million (CAD) in revenue from seven existing California cannabis businesses that APB did not then own.  On the date Lee sent the projection, APB did not even have $1 million CAD in its bank accounts and no means of acquiring businesses generating over a hundred million in yearly revenue.

32.    To convince First Offering investors that their entire investment would be secured by a lien on the Oregon Farm, APB repeatedly misrepresented the value of the Oregon Farm.

33.    In the summer of 2017, Lee and Rice told prospective Investor 5 that the value of the Oregon Farm exceeded $60 million.  By that time, Jackson County Oregon had sent DJ & S a tax bill that assessed the "real market value" of the Oregon Farm at approximately $1.9 million. Because APB had caused DJ & S to grant over $7 million in liens on the Oregon Farm – including liens in favor of some of APB's suppliers and service providers – if the Oregon Farm was only worth $1.9 million, there was no equity in the Oregon Farm to serve as security for any investment Investor 5 might make.

34.    Days after speaking with Lee and Rice, Investor 5 invested $1,000,000 in APB by way of a convertible promissory note, secured by a lien on the Oregon Farm.  Lee and Rice failed to tell Investor 5 about the existing liens on the Oregon Farm and the Jackson County valuation before Investor 5 made his investment.

35.    On April 4, 2018, APB received an appraisal (the "BVA Appraisal") it had commissioned in an effort to record the $8.7 million purchase of Urban Pharms pursuant to Generally Accepted Accounting Principles ("GAAP").

36.     The BVA Appraisal, performed by a Chartered Financial Analyst, identified categories of assets required to be separately valued, which included cash, inventory, real property, equipment, customer contracts, and tradenames.  The BVA Appraisal made clear that any portion of the purchase price that could not be supported by a valuation of an identifiable asset had to be allocated to goodwill.

37.     The BVA Appraisal valued the Oregon Farm by assessing recent sales of comparable real property and the nature, age, and condition of the improvements, concluding that, as of 2016, the value of the improved real property was $3.5 million.  After conducting separate valuations of Urban Pharms' remaining identifiable assets, the BVA Appraisal concluded that almost half of the $8.7 million APB had paid for Urban Pharms was not supported by the value of any identifiable asset and had to be allocated to goodwill.

38.     On November 5, 2018, just months after receiving the BVA Appraisal, APB purported to perform its own current valuation of the Oregon Farm (the "APB Valuation").  Rather than assessing recent comparable real property sales as the BVA Appraisal had done, APB looked at the purchase price paid for six cannabis businesses as reported in news articles.

39.     In some cases, APB assumed that the entire purchase price for the business was allocable to the real property rather than any of the other types of assets identified in the BVA Appraisal, such as cash, inventory, or customer contracts.  In other cases, APB allocated a portion of the purchase price to non-real estate assets and then allocated all of the remaining purchase price to the business' real estate, although GAAP required any portion of the purchase price not supported by a valuation to be allocated to goodwill.

40.     Using these false assumptions, the APB Valuation thus concluded that the Oregon Farm, professionally appraised at $3.5 million as of September 2016, was worth between $190

million to $272 million two years later.

41.    On November 5, 2018, Rice e-mailed the APB Valuation to a representative of Investor 1, Investor 2, and Investor 4.

42.    In December 2018, Rice falsely told representatives of Investor 1 and Investor 5 that APB was about to close on $30 million in financing, contingent on a first lien on the Oregon Farm.  To allow the financing to close, Rice requested that Investors 1 and 5 agree to subordinate their liens or convert their promissory notes to APB securities.  Based on the promise of imminent financing, Investor 1 converted its promissory notes to APB securities, thus relinquishing its liens on the Oregon Farm.

43.    To convince First Offering investors that APB was a large cannabis company with expanding operations, APB falsely told investors that it had dispensaries, farms, and customers in other states and countries and would be operating a cannabis business in Puerto Rico through a company called PR-One.

44.    In the April 2018 presentation described above, APB claimed that PR-One would be operating retail cannabis stores in Puerto Rico, had already completed four asset acquisitions, and was projected to generate revenue in the third quarter (July – September) of 2018.  In fact, PR-One reported to the Puerto Rican government in both 2018 and 2019 that it did not own any property.  In addition, more than a year after PR-One was supposed to be generating revenue from cannabis sales, APB conceded that PR-One had not grown any cannabis or opened any cannabis dispensaries.

45.    On October 31, 2018, an APB employee emailed prospective Investor 6 a term sheet, subscription documents, and other promotional materials.  The presentation claimed that APB had extensive revenue-generating operations in Colorado that included six dispensaries, one

with $400,000 per month in gross revenues, an indoor cultivation facility with harvests five times a year, and a manufacturing facility for cannabis lotions, candies, and the like. APB did not have business operations in Colorado. Rice was copied on the email, but did not correct the inaccurate statements made in the presentation.

46.    On January 12, 2019, an APB employee emailed Rice a draft presentation for review. The presentation falsely stated that APB owned a dispensary in Colorado. Rice did not correct the presentation and the employee subsequently emailed the presentation to Investor 4.

47.    On March 9, 2019, Lee emailed Investor 5 claiming that, in Puerto Rico, APB had 2,700 acres of cannabis under "Cultivation and Export now" and that, in Curaçao, APB had "300 acre Export Cultivation ready to go, Aruba right behind." Lee further claimed that APB had a million pound purchase order from a Canadian buyer. Because the United States classifies cannabis as a Schedule I controlled substance, it would have been illegal for APB to import or export cannabis to or from Canada, Curaçao, or Aruba. Moreover, APB had not directly, or through PR-One, grown cannabis in Puerto Rico.

48.    APB stopped preparing audited financial statements in 2016, which had multiple detrimental effects. The lack of audited financial statements kept investors from discovering that APB's revenues and operations were not as APB had represented them; it jeopardized investors' ability to trade APB securities via a trading platform called OTC Link; and it jeopardized APB's ability to apply for its securities to be traded on more widely-accessible trading platforms, such as NASDAQ.

49.    Although APB was not close to completing audited financial statements until the fall of 2019, and never did actually complete them, APB falsely assured investors that the completion of audited financial statements was imminent, while failing to disclose that the

delinquent audited financial statements jeopardized investors' access to trading platforms.

50.    APB's securities were registered with the Commission under Section 12(g) of the Exchange Act, which required APB to file quarterly and annual reports with the SEC.  The annual reports required audited financial statements.

51.    APB's securities were quoted on OTC Link, a trading platform that allows Broker-Dealers to publish prices at which they will buy and sell securities not listed on a securities exchange such as NASDAQ.

52.    APB stopped making the filings required to maintain its SEC registration as of 2016.  Because of APB's delinquency, there was a risk that the SEC would institute a trading suspension prohibiting Broker-Dealers from publishing quotes for APB securities on OTC Link, thus impairing the ability of APB investors to trade their APB securities.

53.    The delinquency could also result in revocation of APB's registration, which would likely prevent the securities from qualifying for listing on an American exchange.

54.    APB did not engage an accountant to prepare its delinquent 2016 statement until November 2017 and the accountant ("Accountant 1") did not begin working on the statement until 2018.  In the course of their work, Accountant 1 learned that APB was making payments to and on behalf of PR-One under a contract granting APB the right to acquire 40% of PR-One's securities in exchange for $5 million in cash and $5 million in APB securities.

55.    In the summer of 2018, Accountant 1 advised Pallas and Lee that they viewed PR-One as a subsidiary of APB and that PR-One's financial statements should be consolidated with APB's.  Lee and Pallas disagreed and the issue as to the true nature of APB's relationship with PR-One remained unresolved.

56.    Almost a year later, in September 2019, APB provided Accountant 1 with a

statement from PR-One claiming that it was a debtor of APB, not a subsidiary.  Accountant 1 again began working on finalizing the financial statements then outstanding when an APB employee informed Accountant 1 that Lee did not intend to allow APB to pay for the work.  In late 2019, Accountant 1 informed APB that they would not finalize the financial statements without payment, which was never forthcoming.

57.    At all times, Accountant 1 kept Lee and Pallas apprised of the issues preventing Accountant 1 from completing APB's financial statements.   Nevertheless, Lee and Rice continually assured investors that the financial statements would soon be filed or had been filed:

(a)    In an October 7, 2017 email to Investor 1, an APB employee stated that APB "expect[ed] all of the 2016 [SEC] filings to be completed within 30 days and the 2017 10-Q's within a few weeks thereafter," although APB had not yet engaged Accountant 1.  Neither Lee nor Rice, who were both copied on the email, corrected the APB employee's unfounded projection.

(b)    In a November 2017 email to Investor 1, Rice claimed that APB had "cleaned up the SEC IRS incompleteness reported earlier."  This statement was false.  APB had not cured any of the delinquent filings.

(c)    In April and September 2018 emails to Investor 1 and Investor 3, an APB employee stated that APB's delinquent filings would be complete "within the next few weeks" and "are being completed now," even though the PR-One accounting issue was unresolved.  Rice, who was copied on the email, did not correct the APB employee's unfounded projection.

(d)    During a February 2019 investor meeting, Lee assured investors that audits of the financial statements were about to be completed, even though the PR-One accounting issue remained unresolved.

(e)    In an August 2019 email to Investor 3, Lee claimed that APB's "SEC filings [were] scheduled for completion end of August" even though the PR-One accounting issue remained unresolved.

58.    By July 2019, the $20 million from the First Offering investors was largely spent, with a significant amount going to Lee, Rice, Pallas, PR-One, and CBE.

59.    APB had paid millions to or on behalf of PR-One.  Of that amount, Lee had taken

over $1.1 million in petty cash.  APB had also paid CBE over $2 million for costs and expenses associated with CBE's purchase of real property in Puerto Rico, none of which was titled in the name of APB or PR-One, the entity through which APB was purportedly conducting a Puerto Rican cannabis business.

60.    None of the investor funds had resulted in a profitable business.

## II.    The Second Offering – July 2019 through March 2020

61.    Starting in approximately July 2019 through March 2020, APB offered $30 million worth of convertible promissory notes to investors located in Puerto Rico.  Ultimately, the offering raised over $3.2 million from 47 individual investors.

62.    The offering was promoted by a Broker-Dealer through a "private placement," a type of securities offering that can only be promoted to "accredited" investors, those who are sophisticated and have a high net worth.

63.    Lee and Pallas approved promotional materials for the Broker-Dealer for electronic distribution to prospective investors and Lee personally emailed some of them to the Broker-Dealer.  The promotional materials included a letter with a link to a video, a Private Placement Memorandum ("PPM"), and a presentation.

64.    The letter imparted a sense of urgency to invest before APB made its securities available to the general public:

> [W]e would like to introduce American Patriot Brands, Inc. (APB) - a compelling investment designed for accredited investors such as yourself. . . . .  The greatest investor returns have come from "late stage" pre-public investments in U.S. based, vertically integrated, multi-state operators like APB. . . . .  APB is planning on becoming a listed publicly traded company in less than six months.  This is APB's last "pre-public" financing offering before the company begins to trade their stock as a public company. This late stage "pre-public" offering is unique for investors, as this opportunity provides a high potential return on investment[.]

65.    Following up on that theme, in the PPM, APB claimed that one of the principal

benefits of investing in the notes was the ability to convert them into shares of a publicly traded company and that APB's shares would continue to trade on OTC Markets until APB could cure its filing delinquencies and apply to have its securities listed on a more "reputable" trading platform, followed by a specific reference to NASDAQ.

66.    Similarly, the presentation suggested that APB's stock would soon be listed on an exchange where the price of APB stock would skyrocket:  "APB Estimated Stock Market Valuation Based on 3-Year Projected Revenue Year 1 $5.29, Year 2 $9.96, Year 3 $17.67."  Based on these projections, the offered convertible promissory notes, which had a $1 conversion price, had an extremely high rate of return.

67.    The materials failed to disclose that APB's years-long failure to file required reports with the SEC could terminate the trading of APB securities on OTC Link and could lead to the revocation of its registration, likely preventing its securities from being listed on any American exchange, including NASDAQ, an exchange specifically referenced in the PPM.

68.    The letter also described the investment offered as a "Senior Secured Debt Position, secured with a 1st Trust Deed Security interest in the Company's prized 275-acre Urban Pharms property."  The letter failed to tell investors that the Oregon Farm had been professionally appraised as of 2016 at $3.5 million, had received a "real market value" appraisal by Jackson County Oregon in late 2018 of $2.83 million, and was, by then, encumbered with an unsubordinated $3.5 million lien.  At the higher valuation, there would only be $35,000 in equity to secure the Second Offering investors' notes.

69.    In the PPM, APB claimed that, through a joint venture with a third-party facilitator (the "License Facilitator"), APB had obtained eight licenses to operate cannabis dispensaries in California, had applied for 49 additional California licenses, and believed it would receive the

necessary licenses.  The promotional materials failed to tell investors that the License Facilitator had informed APB that APB's limited finances would adversely impact the pending license applications and APB's ability to make use of the granted applications.

70.     The presentation continued to claim that a famous retired United States Army General was APB's "Chief Humanitarian and Global Economic Advisor," when APB had previously claimed that the General resigned from the Company in 2016.

71.     Lee personally emailed the Broker-Dealer an updated version of the APB Valuation, which, based on the same faulty methodology, concluded that the Oregon Farm was worth $216 million.

72.     In the PPM, APB claimed it would use investor funds to purchase 40% of PR-One and failed to disclose that it had already paid more than double the cash component of the purchase price for a 40% interest in PR-One.  APB continued to claim that PR-One owned property that would be operated as cannabis dispensaries, but PR-One reported to the Puerto Rican government in 2019 that it owned no property.

73.     Because of APB's failure to file periodic reports, in September 2019, the SEC suspended the trading of APB securities, effectively terminating the securities' trading on the OTC Link trading platform.  On October 2019, APB consented to the revocation of the SEC registration of APB's securities.  Without the registration, APB stock was likely ineligible for listing on any American exchange, including NASDAQ.

## III.     The Third Offering – July 2021 through June 2022

74.     By July 2021, APB was not timely paying its obligations as evidenced by the fact that it was in default on all of the convertible promissory notes owed to investors in the Second Offering, had suffered a $679,810 judgment by one creditor, and had been sued by at least one

investor for breach of the obligation to pay a $3.5 million convertible promissory note.  Moreover, APB, Lee, Pallas, and Rice had been sued for fraud by many of the First Offering investors.

75.    In defense of one of the lawsuits, Lee obtained an appraisal that valued the Oregon Farm at $17 million.  This appraisal was performed by an individual who, months after completing it, agreed to relinquish their California appraisal license because several of their appraisals did not comply with professional appraisal standards.  The appraisal was many times higher than the most recent "real market value" appraisal by Jackson County, Oregon, which was just over $2.4 million.

76.    From July 2021 through at least June 2022, APB conducted a third offering of convertible promissory notes.  The offering was advertised via a publicly available website that included a video featuring Lee.

77.    In the video, Lee claimed that investors could have "absolute confidence and peace of mind that [the notes] were a collateralized, protected investment" because they were secured by the Oregon Farm.  Lee failed to tell prospective investors that the Oregon Farm had been appraised as of January 2020 at $17 million, had received a much lower "real market value" appraisals from Jackson County Oregon, and was encumbered with millions in liens, calling into question whether there was sufficient equity to secure additional investment.  Lee also failed to disclose that APB was not making note payments to other investors, who had sued for that reason.

78.    In the video, Lee stated that Urban Pharms is "a 275-acre licensed cannabis production farm" but failed to also disclose that the license only allowed Urban Pharms to grow 40,000 square feet of cannabis canopy, an amount just less than one acre.

79.    In the video, Lee stated that Urban Pharms is "one of the largest legal marijuana farms . . . in the country."  Lee failed to also tell investors that the statement was based on the acreage of the Oregon Farm, not the number of acres licensed for production or the amount of

cannabis produced, both of which were far smaller than many other cannabis farms in the United States.

## IV.    The Fourth Offering – 2022 through Present

80.    From at least 2022 through the present, DJ & S has offered the Garden Units through at least two publicly available real estate brokerage websites.

81.    Lee and Pallas began planning the sale of the Garden Units in approximately December 2020 and, by January 2022, had developed a brochure to promote their sale.

82.    Ultimately the brochure that was posted on the real estate broker websites included multiple misrepresentations and omissions including:

(a)    that the Oregon Farm is "one of the largest legal Cannabis Farms in the U.S." without disclosing that the statement is based on the acreage of the Oregon Farm, not the number of acres in production or the amount of cannabis produced, which is far smaller than many other cannabis farms in the United States;

(b)    that the investors' field, known as Garden #1, had a "2021 harvest of more than 24,000 pounds of sun grown flower," when Urban Pharms' entire gross harvest for 2021 was less than 19,000 pounds with only 5,000 pounds of sellable material; and

(c)    that Urban Pharms had "produced nearly 100,000 lbs of flower since inception," when it has only produced 25,000 pounds since inception.

## V.    The Misrepresentations And Omissions Were Material, Made With Scienter, And Made Through The Instrumentalities Of Interstate Commerce

83.    Lee and Rice made statements directly to investors that they knew, or were reckless or negligent in not knowing, were false, included partial information that was misleading, and included projections based on inaccurate facts and unreasonable methodologies.

84.    Lee, Rice, and Pallas reviewed, approved, and had ultimate authority over presentations, Oregon Farm valuations, videos, private placement memoranda, website listings, and APB employee emails (the "Investor Materials"). Lee, Rice, and Pallas knew, or were reckless or negligent in not knowing, that the Investor Materials were false, included partial information

that was misleading, and included projections based on inaccurate facts and unreasonable methodologies.  Lee, Rice, and Pallas, directly and through others, disseminated the Investor Materials to investors with the intent that investors would rely on them.

85.    Lee and Rice obtained money through the statements they made to investors, and Lee, Rice, and Pallas obtained money through the dissemination of Investor Materials.

86.    All of the misrepresentations and omissions were material because they would have been important to an investor in deciding whether to invest, to convert a promissory note to APB stock, or to exercise an option to buy APB stock.

87.    Accurate information about past and projected revenues was relevant to the risk of the investment and the size of potential returns, as was information about the scope of APB's operations, whether it owned other farms, historical harvests, and the amount of acres licensed for cultivation.  Information about competing valuations of the Oregon Farm would have allowed investors to assess whether the high valuations provided by APB were accurate.  Coupled with information about the liens on the Oregon Farm, the competing valuations would also have allowed investors to assess whether APB had sufficient revenues to pay its operating expenses and whether a lien on the Oregon Farm would fully secure promissory note investments.  Accurate information about the status of APB's efforts to become compliant with SEC reporting requirements would have been relevant to the competency of APB's management, the eligibility of APB securities to continue trading on OTC Link, and the likelihood that APB securities would qualify for listing on an American exchange.

88.    The statements made to existing investors in the First Offering were also intended to convince them that their funds had been put to their intended use and that APB management was taking care of the SEC filing delinquencies.  These statements were intended to placate the

First Offering investors so that they would not take action that could interfere with APB's ability
to continue making fraudulent offerings to new investors.

89.     The misrepresentations and omissions were made through the internet, the
telephone, and the mails, which are means and instrumentalities of interstate commerce.

### MISAPPROPRIATION OF INVESTOR FUNDS AND APB ASSETS

90.     During the Relevant Period, Lee, Pallas, and Rice misappropriated investor funds
through payments to Relief Defendants PR-One and CBE, excessive payments to themselves, and
payment of personal expenses.

91.     In 2017, Lee executed, on behalf of APB, an agreement with PR-One, a company
partly owned by Lee, who is also PR-One's Chairman.  Under the agreement, APB agreed to pay
$5 million in cash and $5 million in APB securities to PR-One, which did not then have any
business operations, in exchange for a right to acquire 40% of PR-One's outstanding stock.

92.     By September 2019, Lee and Pallas had paid from APB's accounts over $9 million
to or on behalf of PR-One.  To avoid showing PR-One as an APB subsidiary on the financial
statements, Lee and Pallas provided Accountant 1 with a document in which PR-One claimed to
be APB's debtor and an opinion letter from counsel opining that APB owned no interest in PR-
One.  A month later, however, APB was again claiming, by way of an updated PPM in the Second
Offering, that it had a right to acquire 40% of PR-One.

93.     Of the millions that APB paid to PR-One or on its behalf, at least $1.1 million was
taken by Lee in petty cash, over $140,000 went for apartment rentals in Puerto Rico (at least one
of which was an apartment for Lee), and additional amounts went to pay Lee's living expenses.

94.     Despite the millions in payments to PR-One, as of late 2021, APB claimed that it
had no ownership interest in PR-One and APB has received little to nothing in exchange for its
millions.

95.     In late 2017 and early 2018, Lee and Pallas caused APB to pay over $2 million to CBE that CBE used to purchase real property in Puerto Rico.  The property CBE purchased was not titled in the name of APB or PR-One, the entity APB claimed it was using to develop real property in Puerto Rico into cannabis dispensaries.

96.     Lee, Pallas, and Rice paid themselves, collectively, a large share of investor funds. In some years, the amounts the officers paid themselves were many times the revenues generated from cannabis sales.

97.     In 2018, Lee and Pallas caused APB to grant them liens on the Oregon Farm for $750,000 and $323,478, respectively.

98.     Lee and Pallas caused APB to pay over $160,000 in fees to a luxury beach resort that Lee and his wife frequented in Newport Beach, California.

99.     Lee and Pallas also caused APB to pay for personal expenses including items at Bed, Bath & Beyond, Marshalls, a Chili's restaurant, a Disney Store, Toys R Us, GameStop, and Harley Davidson.

100.    During the Relevant Period, Lee, Pallas, and Rice issued themselves millions of shares of APB stock for which they did not provide fair value including over 11 million shares issued to Lee, over 4 million shares issued to Pallas, and 1.8 million shares issued to Rice.

101.    The payments and stock transfers were made through the internet and the mails, which are means and instrumentalities of interstate commerce.

**ILL-GOTTEN GAINS WERE TRANSFERRED TO THE RELIEF DEFENDANTS, WHO
HAVE NO LEGITIMATE CLAIM TO THEM**

102.    During the Relevant Period, APB transferred ill-gotten gains to the Relief Defendants.

103.    APB transferred millions in cash to PR-One and paid millions of expenses on its

behalf and has received little to nothing in return.

104.    APB has transferred millions in cash to CBE for the purchase of properties that are not titled in the name of either APB or PR-One, the entity through which APB claims to be developing a Puerto Rican cannabis business.  APB also made additional payments and provided other items of value to CBE for which APB received little or no consideration.

105.    Legion, which is owned by APB's controller Rosalie Frances D'Amico (formerly known as Lee Patin), received millions of dollars in funds raised from APB investors into its bank accounts.  APB directed D'Amico to make specific payments to APB employees, investors, and others, and D'Amico used the remaining APB funds in the Legion account to pay personal expenses and to make payments to herself and her relatives.

106.    Because the Relief Defendants provided nor consideration, or less than full consideration, for these ill-gotten gains, they have no legitimate claim to them.

### CLAIMS FOR RELIEF

**COUNT I**
**Section 17(a) of the Securities Act**
**[15 U.S.C. § 77q(a)]**
**Defendants**

107.    The Commission realleges and incorporates by reference paragraphs 1 through 101.

108.    By engaging in the acts and conduct alleged above, Defendants APB, Urban Pharms, DJ & S, TSL, Lee, and Rice directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, (1) knowingly or recklessly employed devices, schemes, or artifices to defraud; (2) with knowingly, recklessly, or negligently obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make statements made, in the light of the circumstances under which they were made, not misleading;

and (3) knowingly, recklessly, or negligently engaged in transactions, practices, or courses of

business which operated or would operate as a fraud or deceit upon the purchasers, in violation of

Section 17(a)(1), (2), and (3) of the Securities Act [15 U.S.C. § 77q(a)(1), (2) and (3)].

109.    By engaging in the acts and conduct alleged above, Defendant Pallas directly or

indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or

communication in interstate commerce or by use of the mails, (1) knowingly or recklessly

employed devices, schemes, or artifices to defraud and (2) knowingly, recklessly, or negligently

engaged in transactions, practices, or courses of business which operated or would operate as a

fraud or deceit upon the purchasers, in violation of Section 17(a)(1) and (3) of the Securities Act

[15 U.S.C. § 77q(a)(1) and (3)].

110.    Pallas also knowingly or recklessly provided substantial assistance to Lee, Rice,

APB, Urban Pharms, DJ&S and TSL in defrauding investors.  Pursuant to Section 15(b) of the

Securities Act [15 U.S.C. § 77o(b)], Pallas is liable for their violations of Section 17(a)(1), (2),

and (3) of the Securities Act [15 U.S.C. § 77q(a)(1), (2) and (3)] to the same extent as they are.

111.    By reason of the foregoing, Defendants violated and, unless restrained and

enjoined, will continue to violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

**COUNT II**
**Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**
**[15 U.S.C. § 78q(b), 17 C.F.R. § 240.10b-5]**
**Defendants**

112.    The Commission realleges and incorporates by reference paragraphs 1 through 101.

113.    By engaging in the acts and conduct alleged above, Defendants APB, Urban

Pharms, DJ & S, TSL, Lee, and Rice directly or indirectly, in connection with the purchase or sale

of securities, by the use of means or instrumentalities of interstate commerce, or of the mails

knowingly or recklessly, (a) employed devices, schemes, or artifices to defraud; (b) made untrue

statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities, in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and subsections (a), (b) and (c) of Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5(a), (b) and (c)].

114. By engaging in the acts and conduct alleged above, Defendant Pallas directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or of the mails knowingly or recklessly, (a) employed devices, schemes, or artifices to defraud; and (b) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities, in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and subsections (a) and (c) of Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

115. Pallas also knowingly or recklessly provided substantial assistance to Lee, Rice, APB, Urban Pharms, DJ&S and TSL in defrauding investors. Pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78o(e)], Pallas is liable for their violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and subsections (a), (b) and (c) of Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5(a), (b) and (c)] to the same extent as they are.

116. By reason of the foregoing, all Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## COUNT III
## Unjust Enrichment
## Relief Defendants

117.   The Commission realleges and incorporates by reference paragraphs 1 through 106.

118.   The Relief Defendants received, directly or indirectly, funds or other property from APB, which are either the proceeds of, or are traceable to the proceeds of, the unlawful activities alleged in this Complaint to which they have no legitimate claim.

119.   It would be inequitable for the Relief Defendants to retain the proceeds of violations of the federal securities laws and such proceeds should be disgorged.

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court enter a judgment:

1.   Permanently restraining and enjoining Defendants from, directly or indirectly, violating Sections 17(a) of the Securities Act [15 U.S.C. §§ 77e, 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

2.   Permanently restraining and enjoining Defendants Lee, Rice, and Pallas from, directly or indirectly, including but not limited to, through any entity owned or controlled by each individual, participating in the issuance, purchase, offer, or sale of any security provided, however, that such injunction shall not prevent each individual from purchasing or selling securities for his own personal accounts;

3.   Permanently prohibiting Defendants Lee, Rice, and Pallas, pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e) and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange act [15 U.S.C. 78*l*] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d);

4.   Ordering Defendants to pay civil penalties pursuant to Section 20(d) of the

Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)];

    5.    Ordering Defendants and Relief Defendants to disgorge ill-gotten gains according to proof, plus prejudgment interest thereon; and

    6.    Granting such other and further relief as this Court may deem just, equitable, or necessary.

## JURY DEMAND

    Plaintiff demands a trial by jury.

March 16, 2023

Respectfully submitted,

Samantha M. Williams
Special Temporary Permission for
Governmental Attorney No. G03809
U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549
202.551.4061
williamssam@sec.gov

*Attorney for the United States Securities and
Exchange Commission*

25