EUGENE N. HANSEN (*pro hac vice*)
Email: hansene@sec.gov
SAMANTHA M. WILLIAMS (*pro hac vice*)
DOUGLAS M. MILLER (Cal. Bar. No. 240398) (local counsel)
100 F Street NE
Washington, DC 20549
Tel: (202) 551-6091
*Attorneys for Plaintiff*
*Securities and Exchange Commission*

RUSSELL D. DUNCAN (*pro hac vice*)
Email: rduncan@clarkhill.com
KATE M. NOVAK (*pro hac vice*)
RANDOLF W. KATZ
Clark Hill PLC
555 South Flower Street, Suite 2400
Los Angeles, CA 90071
Tel: (213) 891-9100
*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> AMERICAN PATRIOT BRANDS, INC., *et al.*, <br><br> Defendants. | Case No. 2:23−cv−05379−AH−BFM <br><br> **JOINT BRIEF ADDRESSING PLAINTIFF SEC'S MOTION FOR PARTIAL SUMMARY JUDGMENT** <br><br> Hearing Date: May 21, 2025 <br> Time:  1:30 pm <br> Ctrm:  Los Angeles, First Street, 7D <br> Judge:  Hon. Anne Hwang |

# **TABLE OF CONTENTS**

SEC'S INTRODUCTION ...................................................................1

DEFENDANTS' INTRODUCTION ...................................................2

SEC'S STATEMENT OF FACTS ......................................................2

PART I: GENERAL FACTUAL BACKGROUND ..............................2

    A.    Defendants...................................................................2

    B.    Urban Pharms' Marijuana Operations ..................................4

    C.    APB's Investments In And Operations Of Urban Pharms .................5

    D.    Defendants Raise More Than $50 Million From Investors But Fail To Expand Their Operations, Fail To Pay Taxes, And Fail To Pay The Operating Expenses Of Urban Pharms ............6

    E.    APB Suffers Massive Financial Losses, Fails To File Audited Financial Statements, and Has the Registration for Its Common Stock Revoked ..................................................7

    F.    Lee Terminates New CEO Michael Smith After Smith Demands Internal Controls and Transparency Regarding Puerto Rico .............8

    G.    Compensation to Lee, Pallas and Rice...............................9

PART II: DEFENDANTS' MISSTATEMENTS AND OMISSIONS IN CONNECTION WITH SECURITIES OFFERINGS ...........................11

    A.    Initial Offering And Defendants' Misstatements, Omissions, And Deceptive Conduct To Raise Money ........................11

        1.    Background ...............................................11

        2.    Misrepresentations and Deceptive Conduct in Connection with the Initial Offering [Lee, Rice, APB, Urban Pharms, and TSL].................................................11

            a.    *Misrepresentations Regarding Company Assets* .....................11

i

b.   *Misrepresentations Regarding APB's Financial Condition* ..... 14

c.   *Misrepresentations Regarding General Wesley Clark* ............. 14

d.   *Misrepresentations Regarding Use of Investor Funds* ............. 16

B.   Stonecrest Offering And Defendants' Misstatements,
     Omissions, And Deceptive Conduct To Raise Money ..................... 16

  1.   Background ........................................................................... 16

  2.   Misrepresentations and Deceptive Conduct in Connection
       with the Stonecrest Offering [Lee, APB, Urban Pharms,
       and TSL] ............................................................................... 17

    a.   *Misrepresentations Regarding "Company Assets"* ................. 17

    b.   *Misrepresentations Regarding Security/Collateral* ................. 19

    c.   *Misrepresentations and Omissions Regarding APB's*
         *Financial Condition* ................................................................. 22

    d.   *Misrepresentations Regarding General Clark* ........................ 22

C.   $5 Million Raise And Defendants' Lies And Omissions To
     Raise Money ..................................................................................... 23

  1.   Background ........................................................................... 23

  2.   Misrepresentations and Deceptive Conduct in Connection
       with the $5 Million Raise [Lee, Pallas, APB, Urban Pharms] ....... 24

    a.   *Misrepresentations Regarding Supposed Puerto Rican*
         *Assets* ....................................................................................... 24

    b.   *Misrepresentations Regarding Oregon Assets* ........................ 25

    c.   *Misrepresentations Regarding Security/Collateral* ................. 26

    d.   *Misrepresentations and Omissions Regarding APB's*
         *Financial Condition* ................................................................. 26

D.   The Garden Unit Offering And Defendants' Lies And

Omissions ...................................................................................27

    1.   Background ...................................................................27

    2.   Misrepresentations and Deceptive Conduct in Connection
with the Garden Unit Offering [Lee, Pallas, APB, Urban
Pharms, and DJ&S] ....................................................................29

       a.   *Misrepresentations Regarding the Size and Output of
Urban Pharms' Operations* ...............................................29

       b.   *Misrepresentations and Deceptive Conduct Regarding
Urban Pharms' Financial Performance* ..............................32

       c.   *Misrepresentations Regarding the Use of Investor
Proceeds* ...........................................................................33

       d.   *Misrepresentations Regarding Security/Collateral* ...............33

DEFENDANTS' COUNTER STATEMENT OF FACTS ..................................34

SUMMARY JUDGMENT STANDARD ........................................................34

ARGUMENT ...............................................................................................35

I.   SUMMARY OF ARGUMENT ...............................................................35

   A.   SEC ...............................................................................35

   B.   Defendants' Response: Summary of Argument ..............................36

II.   MISSTATEMENTS AND OMISSIONS REGARDING SUPPOSED
COMPANY ASSETS ...........................................................................37

   A.   SEC's Argument ...............................................................37

       1.   Defendants Made and Disseminated Material Misstatements ......37

       2.   Lee, Pallas, and Rice Acted with Scienter ...............................39

   B.   Defendants' Response: The SEC Has Failed To Prove That
The Defendants Made and Disseminated Material Misstatements
Regarding Company Assets Or Acted With Scienter. ......................42

1. The SEC has offered no evidence that Defendant Rice made a material misstatement regarding APB's assets to any investor or prospective investor. ...........................42

2. The SEC has not shown that Defendants Lee or Pallas made material misstatements regarding the Company's assets...............44

III. MISSTATEMENTS AND OMISSIONS CONCERING SECURITY/COLLATERAL ...........................................................46

A. SEC's Argument ...........................................................46

1. Defendants Made and Disseminated Material Misstatements.......46

2. Lee and Pallas Acted with Scienter..................................47

B. Defendants' Response.......................................................50

1. Defendants Lee and Pallas Did Not Make and Disseminate Material Misstatements Concerning Security/Collateral. ..............50

IV. MISSTATEMENTS AND OMISSIONS CONCERNING APB'S AND URBAN PHARMS' FINANCIAL AND BUSINESS PERFORMANCE...........................................................51

A. SEC's Argument ...........................................................51

1. Defendants Made and Disseminated Material Misstatements.......51

2. Lee, Pallas, and Rice Acted with Scienter ......................52

B. Defendants' Response: The SEC Has Failed To Prove The Defendants Made Misstatements And Omissions Regarding APB's And Urban Pharm's Financial And Business Performance ...........................................................54

1. The SEC Has Failed To Prove That Defendant Rice Lied About APB's Financial Performance in 2018. ..............54

2. The SEC has failed to prove that Defendants Lee and Pallas acted with scienter regarding financial performance. .........55

V. MISSTATEMENTS AND OMISSIONS CONCERNING GENERAL CLARK'S INVOLVMENT WITH APB ..................................56

iv

A.    SEC'S Argument...........................................................56

B.    Defendants' Response................................................57

1.    Neither Lee Nor Rice Misled Investors Concerning General
Clark's Involvement With APB....................................57

VI.    MISSTATEMENTS AND OMISSIONS CONCERNING THE
USE OF INVESTOR FUNDS...................................................58

A.    SEC's Argument ........................................................58

B.    Defendants' Response................................................60

VII.    OTHER FACTS CONCERNING SCIENTER ...........................61

A.    SEC's Argument: The Entire Record Establishes Scienter ...............61

B.    Defendants' Response................................................62

1
2

## <u>TABLE OF AUTHORITIES</u>

**<u>Cases</u>**

3
4
*Gebhart v. SEC,*
   595 F.3d 1034 (9th Cir. 2010) ..................................................................48

5
6
*In re ChinaCast Educ. Corp. Sec. Litig.,*
   809 F.3d 471 (9th Cir. 2015) ....................................................................39

7
8
*In re Oracle Corp. Sec. Litig.,*
   627 F.3d 376 (9th Cir. 2010) ....................................................................34

9
10
*Lorenzo v. Securities and Exchange Commission,*
   587 U.S. 71 (2019) ...................................................................................44

11
12
*SEC v. Advance Body Imaging LP,*
   No. 07-cv-1140, 2009 WL 10673586 (C.D. Cal. Mar. 18, 2009) ...............41, 59

13
14
*SEC v. AirTrac, Inc.,*
   No. 06-cv-582, 2008 WL 11334597 (C.D. Cal. Jan. 2, 2008) .....................38, 41

15
16
*SEC v. Blackburn,*
   15 F.4th 676 (5th Cir. 2021) .................................................................. 56-57

17
18
*SEC v. Chen,*
   No. 15-cv-7425, 2016 WL 7469683 (C.D. Cal. Dec. 8, 2016) .........................60

19
20
*SEC v. Dain Rauscher, Inc.,*
   254 F.3d 852 (9th Cir. 2001) ...............................................................35, 39

21
22
*SEC v. Feng,*
   935 F.3d 721 (9th Cir. 2019) ....................................................................34

23
24
*SEC v. First Pacific Bancorp,*
   142 F.3d 1186 (9th Cir. 1998) ..................................................................59

25
26
*SEC v. GenAudio, Inc.,*
   32 F.4th 902 (10th Cir. 2022) ............................................................38, 40, 49

27
28
*SEC v. George,*
   426 F.3d 786 (6th Cir. 2005) ....................................................................41

*SEC v. Global Express Capital Real Estate Inv. Fund, I, LLC*,
   289 Fed. Appx. 183 (9th Cir. 2008)................................................................52

*SEC v. Jakubowski*,
   150 F.3d 675 (7th Cir. 1998) ...............................................................41

*SEC v. Johnson*,
   No. 20-cv-8985, 2023 WL 2628678 (C.D. Cal. Feb. 17, 2023)......................35

*SEC v. Karroum*,
   No. 17-cv-0187, 2018 WL 11230398 (E.D. Va. Feb. 2, 2018)........................60

*SEC v. Loomis*,
   969 F. Supp. 2d 1226 (E.D. Cal. 2013) .......................................47, 49

*SEC v. Lyttle*,
   538 F.3d 601 (7th Cir. 2008) ...................................................... 41, 61-62

*SEC v. Milan Group, Inc.*,
   962 F. Supp. 2d 182 (D.D.C. 2013)................................................41

*SEC v. Murphy*,
   626 F.2d 633 (9th Cir. 1980) ......................................................52

*SEC v. Navellier & Assocs.*,
   108 F.4th 19 (1st Cir. 2024)................................................48, 59

*SEC v. Platforms Wireless Int'l Corp.*,
   617 F.3d 1072 (9th Cir. 2010) ...........................................35, 38, 39

*SEC v. Premier Holding Corp.*,
   No. 18-cv-813, 2020 WL 8099514 (C.D. Cal. Nov. 30, 2020)............. 47, 49-50

*SEC v. Presto Telecommunications, Inc.*,
   237 Fed. Appx. 198 (9th Cir. 2007)................................................62

*SEC v. Radical Bunny, LLC*,
   532 Fed. Appx. 775 (9th Cir. 2013).......................................... 47, 48-49

*SEC v. Research Automation Corp.*,
   585 F.2d 31 (2d Cir. 1978) ..................................................... 58-59

*SEC v. Revolutionary Concepts, Inc.,*
    No. 21-10984, 2022 WL 386085 (11th Cir. Feb. 9, 2022)................................53

*SEC v. Sethi,*
    910 F.3d 198 (5th Cir. 2018) ......................................................38, 41

*SEC v. Skinner,*
    No. 21-cv-5273, 2022 WL 2784811 (C.D. Cal. June 17, 2022) ......................60

*SEC v. Small Bus. Capital Corp.,*
    No. 12-cv-3237, 2013 WL 4455850 (N.D. Cal. Aug. 16, 2013)................47, 49

*SEC v. Smith,*
    No. 04-cv-739, 2005 WL 2373849 (S.D. Ohio, Sept. 17, 2005),
    *aff'd* 208 Fed. Appx. 402 (6th Cir. 2006) ...........................................60

*SEC v. TLC Investments and Trade Co.,*
    179 F. Supp. 2d 1149 (C.D. Cal. 2001) ........................................47, 49

*SEC v. Watkins Pencor, LLC,*
    810 Fed. Appx. 823 (11th Cir. 2020)................................................60

*SEC v. Wayland,*
    No. 17-cv-1156, 2019 WL 2620669 (C.D. Cal. Apr. 8, 2019)......................57

*United States v. Jenkins,*
    633 F.3d 788 (9th Cir. 2011) ........................................................38

**Statutes and Regulations**

Section 10(b) of the Securities Exchange Act of 1934
    [15 U.S.C. § 78j(b)] .................................................................35

Section 17(a) of the Securities Act of 1933
    [15 U.S.C. § 77q(a)].............................................................35, 37

Exchange Act Rule 10b-5
    [17 C.F.R. § 240.10b-5]............................................................35

**<u>Rules</u>**

Fed. R. Civ. P. 56(a)........................................................................... 34-35

Plaintiff Securities and Exchange Commission ("SEC") and Defendants American Patriot Brands, Inc. ("APB"), Urban Pharms, LLC ("Urban Pharms"), DJ & S Property #1, LLC ("DJ&S"), TSL Distribution, LLC ("TSL"), Robert Y. Lee, Brian L. Pallas, and J. Bernard Rice (collectively, "Defendants"), in accordance with the Court's Standing Order for Civil Cases [Dkt. No. 99], respectfully submit this Joint Brief Addressing Plaintiff SEC's Motion for Partial Summary Judgment.[1]

## SEC'S INTRODUCTION

This case concerns a massive, long-running securities fraud. From 2017-2023, Defendants unleashed a fusillade of lies to raise money for their marijuana business. They lied about revenues. They lied about having a marijuana business in Puerto Rico. They lied about having a marijuana business in Colorado. They lied about having marijuana licenses in California and Puerto Rico. They lied about the collateral and the security interests for the investments that they offered, to make extremely risky investments appear to be safe. They lied about having a $500 million purchase order. They lied about the value of their primary asset, a 275-acre property in Oregon. They lied about the use of investor funds. They lied about the purported involvement of General Wesley Clark in their marijuana business. Through these and other material misrepresentations Defendants raised tens of millions of dollars from investors.

The Court should grant summary judgment for the SEC. There are no disputed issues of material fact for a jury to decide. Defendants admit that they made false statements to investors, and those misstatements were material as a matter of law. They apparently challenge their scienter or fraudulent intent. Their arguments fail

---

[1] The SEC seeks summary judgment as to liability but not remedies, which can be addressed in post- summary judgment briefing. The SEC does not seek summary judgment as to all of Defendants' fraudulent misstatements, omissions, and deceptive conduct and reserves its rights with respect thereto. Likewise, the SEC does not seek summary judgment as to Count III, its unjust enrichment claim against the Relief Defendants.

1

considering the undisputed record. For example, Defendants admit that they knew that they had no Puerto Rican cannabis business and admit that they knew General Clark was not involved with the company after it shifted to marijuana. On this undisputed record, Defendants acted at least recklessly as a matter of law.

## DEFENDANTS' INTRODUCTION

The evidence in this case shows that many issues of material fact are disputed and still need to be resolved. The SEC attempts to avoid this fact by, in many instances by making undifferentiated statements about the "Defendants" actions without specifying which Defendant is responsible for the alleged action. In many cases, the SEC attempts to attribute specific actions to all Defendants where the facts show an individual Defendant had no connection to the alleged action. The SEC's allegations also ignores the changing circumstances that made certain actions true at one point in time but no longer true as the years progressed from 2016 to 2023. In these instances, the SEC alleges scienter where none existed because certain statements were properly believed to be true at the time the statements were made. Accordingly, the Court should deny the SEC's motion for summary judgment.

## SEC'S STATEMENT OF FACTS

The SEC sets forth the material undisputed facts in two parts below. Part I provides a general factual background. Part II addresses the false and misleading statements and deceptive conduct at issue in this motion.

## PART I: GENERAL FACTUAL BACKGROUND

### A.     Defendants

Defendant APB is a Nevada corporation with no employees and one small office of less than 400 square feet in Newport Beach, California. Joint Appendix of Facts ("JAF") 1. APB previously was known as The Grilled Cheese Truck, Inc. and operated a food truck business, with its common stock registered with the SEC and traded over the counter ("OTC"). [JAF_2] Then, in 2016, APB decided to enter the marijuana business. [JAF_3] In September 2016, APB acquired Defendants Urban

Pharms and DJ&S for 12,000,000 shares of APB common stock and the assumption of liabilities of Urban Pharms and DJ&S. [JAF_5] According to a memorandum disseminated to investors, APB provided total consideration of $7.6 million to acquire Urban Pharms and DJ&S, including assumption of liabilities. [JAF_205] At the time of the acquisition, DJ&S owned (and still owns) a 275-acre farm located just south of Medford, Oregon (the "Oregon Farm"). [JAF_6] DJ&S's founders acquired the Oregon Farm for $2,050,000 in 2015. [JAF_7] Urban Pharms conducted (and continues to conduct) marijuana-related operations at the Oregon Farm. [JAF_8]

Later, in 2017, APB acquired Defendant TSL. At the time, TSL distributed marijuana to Oregon dispensaries pursuant to an Oregon cannabis distribution license. TSL no longer has any employees or active operations, although it maintains its Oregon distribution license. [JAF_9-11]

Defendant Robert ("Robbie") Lee has acted as APB's CEO and Chairman of the Board of Directors since at least 2016, when the company transitioned from grilled-cheese food trucks to marijuana, except for a brief period beginning in late 2019, when Michael Smith served as APB's CEO (discussed below). [JAF_14] As CEO, Lee had (and has) ultimate responsibility for APB, including raising money from investors. [JAF_15]

For the six-year period relevant to this case, March 2017 to March 2023 (the "Relevant Period"), Lee controlled the finances of APB, Urban Pharms, DJ&S, and TSL ("Corporate Defendants"), including determining which expenses of the Corporate Defendants should be paid and which should not be paid. [JAF_88, 93-96, 113] Lee controlled the finances of the Corporate Defendants even during the brief period when he ceded CEO duties to Smith. [JAF_39, 43, 46] Lee also reviewed and approved the transmission of financial statements to investors. [JAF_88, 242, 268, 273, 475]

Relevant to this motion, in mid-2017 third-party Ricky Castro founded an

entity known as Puerto Rico One Corporation ("PR1"). [JAF_133] Castro was PR1's CEO, while Lee served as Chairman of PR1's Board of Directors. [JAF_134] Lee received stock compensation from PR1 and signed an employment agreement with PR1 providing for annual compensation of $240,000. [JAF_138] On August 1, 2017, APB and PR1 entered into a Capital Investment Agreement whereby APB would obtain a 40% ownership interest in PR1 for consideration of $10 million; however, APB never provided the required consideration and never obtained any equity or ownership interest in PR1. [JAF_141-143, 145] Lee resided in Puerto Rico from mid-2017 through much of 2021, ostensibly to kick-start the Puerto Rico marijuana operations of APB/PR1. [JAF_60]

Defendant Brian Pallas has served as APB's Chief Operating Officer ("COO") since at least 2017, on an interim and permanent basis; Pallas also is and has been a member of APB's Board of Directors since 2018. [JAF_16] Pallas and Lee have been APB's only two corporate officers since 2021, and presently live in California. [JAF_17, 19]

Pallas and Lee jointly exercise management and control over APB's subsidiaries including Urban Pharms, DJ&S, and TSL. [JAF_15, 20-21, 93, 98, 113, 120] Pallas acts as the managing member of Urban Pharms, DJ&S, and TSL. [JAF_21] Both Pallas and Lee execute contracts on behalf of APB's subsidiaries, including contracts relevant to the securities offerings at issue in this case. [JAF_357, 402, 410, 412, 414]

Defendant J. Bernard Rice began consulting for APB around March 2017, obtained the title of Executive Vice President of Corporate Development, and was added the title of Chief Financial Officer in October 2017. [JAF_22] He ceased serving in a formal capacity for APB around July 2019 when APB could no longer pay him. [JAF_23] Rice never assumed traditional CFO responsibilities. [JAF_24]

**B.    Urban Pharms' Marijuana Operations**

Urban Pharms grows marijuana at the Oregon Farm pursuant to licenses

issued by the Oregon Liquor and Cannabis Commission ("OLCC"). [JAF_25] It grows marijuana in two greenhouses, both of which were constructed prior to APB's 2016 acquisition, pursuant to an "indoor" "tier 2" license. [JAF_26] Urban Pharms separately cultivates outdoor ("sun grown") marijuana in two "gardens," each of which is no more than 12 acres in fenced-in size, with a cultivation area of no more than 5 acres, pursuant to two separate "outdoor" "tier 2" licenses. [JAF_27] Each outdoor, tier 2 license limits the mature canopy of the marijuana plants to a maximum of 40,000 square feet—less than one acre. [JAF_28] The first outdoor garden ("Garden 1") has been operational and growing marijuana since APB's 2016 acquisition. [JAF_29] Urban Pharms did not plant the second outdoor garden ("Garden 2") until August 2023, after the filing of this case, when it acquired an additional outdoor, tier 2 license. [JAF_30]

Urban Pharms' cannabis operations take place on a fraction of the Oregon Farm's 275 acres. The cannabis operations occupied a total area of about 15-20 acres prior to the planting of Garden 2 in August 2023, including the fenced-in area of Garden 1, the greenhouses, drying facility, processing facility, office, and parking. [JAF_31] Historically and currently, the Oregon Farm mostly has been used for grazing cattle. [JAF_32]

## C.   APB's Investments In And Operations Of Urban Pharms

APB purchased an active, operating cannabis business when it acquired Urban Pharms in September 2016, inheriting, *inter alia*, the two greenhouses and Garden 1. [JAF_33] After the acquisition, APB made further improvements including constructing a processing facility and a drying facility, improving the greenhouses, and then later building outdoor Garden 2. [JAF_34] In total, from its 2016 acquisition through 2023, APB spent about $2.2 million on marijuana-related improvements to the Oregon Farm. [JAF_35]

**D.** **Defendants Raise More Than $50 Million From Investors But Fail To Expand Their Operations, Fail To Pay Taxes, And Fail To Pay The Operating Expenses Of Urban Pharms**

Defendants claimed to want to expand APB's marijuana operations beyond the 15-25 acres at the Oregon Farm, in Oregon and in other states, Puerto Rico, and the Caribbean. Purportedly to facilitate expansion and to pay operating expenses, Defendants offered securities and ultimately raised more than $50 million from investors from late 2016 through the filing of this case in March 2023. [JAF_4] They did so largely through four securities offerings at issue in this case: (1) from 2017-early 2019, through debt and equity offerings to individual investors solicited by Lee, Rice and APB (the "Initial Offering") [JAF_238-247], (2) from July 26, 2019 through November 15, 2019, through the sale of senior secured convertible notes to Puerto Rican residents (the "Stonecrest Offering") [JAF_289-314], (3) from approximately July 2021 through April 2022, through the sale of membership interests in an entity known as APB Real Estate Holdings, Inc., pursuant to which APB was to issue convertible notes and pay a 10% return to investors (the "$5 Million Raise") [JAF_353-377], and (4) from May 2022 through March 2023, through the sale of membership units in entities that leased the Oregon Farm's Garden 1 and Garden 2, pursuant to which investors were to receive a minimum 10% return, increasing over time, from lease payments by Urban Pharms (the "Garden Unit Offering"). [JAF_408-438]

But Defendants have little to show for their prolific fundraising. As noted above, they expended $2.2 million on improvements to the Oregon Farm and, in August 2023, planted a second outdoor marijuana garden, Garden 2. They otherwise failed to expand their marijuana business despite telling investors that they would use investors' money to expand—and indeed had expanded—their marijuana operations. For example, as discussed below, Defendants told investors that APB had acquired ownership interests in (1) PR1; (2) a Colorado marijuana company known as "Mindful"; (3) at least eight licenses to conduct marijuana operations in

California; and (4) an Oregon hemp farm known as "Sunfire Farms." In fact, APB never acquired or obtained any interest in PR1, Mindful, Sunfire Farms, or any California license. [JAF_143, 185, 190, 197] At all times, APB's sole marijuana business consisted of the Oregon operations of Urban Pharms and TSL. [JAF_12]

Despite this fundraising, Lee directed APB's Controller, Lee Patin, not to pay all tax liabilities, including payroll and trust taxes. [JAF_98] For the trust taxes, Urban Pharms deducted money from employee paychecks for Social Security and Medicare, but then kept that money for itself, rather than remit the withheld money to the IRS. [JAF_99] Urban Pharms also withheld Oregon income taxes from employee paychecks but did not remit the withheld funds to the State of Oregon. [JAF_103] The IRS notified Pallas in January 2018 that Urban Pharms owed payroll taxes of $534,000 and trust taxes of $297,000 [JAF_101], and Pallas prepared a letter dated June 1, 2021, stating that APB owed more than $800,000 in payroll taxes. [JAF_107] As of July 2023, Urban Pharms had more than $1 million in payroll tax liability. [JAF_112] Lee also declined to authorize the timely payment of operating expenses. APB routinely expected Urban Pharms' employees to pay operating expenses, like power bills, on their personal credit cards, claiming a lack of funds despite raising tens of millions from investors. [JAF_116-118] APB sometimes was late on making payroll, and Lee's own mother advanced money for payroll. [JAF_119, 129] And, as discussed below, APB defaulted on payments to investors. [JAF_246, 312, 375, 434]

**E.**    **APB Suffers Massive Financial Losses, Fails To File Audited Financial Statements, and Has the Registration for Its Common Stock Revoked**

APB has never turned a profit despite the infusion of tens of millions in investor proceeds. The company instead has suffered massive operating financial losses totaling more than ($46 million) from 2016 through 2023, including

EBITDA[2] losses of ($8.8 million) in 2017 and ($17.9 million) in 2018. [JAF_79] TSL also has never had an annual profit, and its total operating losses exceed ($7.9 million). [JAF_83] Urban Pharms has had only two profitable years, in 2020 and 2021, with operating losses in other years including a ($2.5 million) loss in 2022. [JAF_82] These financial numbers are Defendants' numbers; APB has failed to complete an outside audit of APB's financials since becoming a marijuana company in 2016. [JAF_77]

Audited financial statements are a requirement for public companies, and, in the absence of audited financial statements and current filings, the SEC may revoke registration of a public company's common stock. [JAF_123-124] That happened to APB effective in October 2019. [JAF_125] Following the revocation of registration, APB common stock ceased being quoted OTC. [JAF_125]

## F.    Lee Terminates New CEO Michael Smith After Smith Demands Internal Controls and Transparency Regarding Puerto Rico

Around the same time as revocation of registration of APB's common stock, on October 1, 2019, Michael Smith became APB's CEO after being recruited for the position by Lee. [JAF_36] Lee remained Chairman of APB's Board of Directors. [JAF_36] Smith previously had been the CEO of Lands' End, Inc., a well-known retailer, and several other companies. [JAF_37] Smith immediately became concerned about significant sums of money being transferred to Puerto Rico, particularly given that APB had no actual operations there and no ownership interest in PR1, and because Lee had a personal interest in PR1, a potential conflict of interest. [JAF_38] Smith did not believe that the company should transfer money to Puerto Rico when it had hundreds of thousands of dollars in tax liability and could not timely pay all operating expenses. [JAF_38] But despite having the title of CEO, Smith had no visibility into APB's finances or a say in how APB expended funds.

---

[2] EBITDA refers to earnings before interest, taxes, depreciation and amortization. According to Rice, EBITDA is "a surrogate for cash in our business." [JAF_266]

[JAF_39]

Smith "sought to right the ship." He attempted to implement financial controls, including dual authorization of all company expenditures, and to prioritize paying the outstanding tax liability. [JAF_40] He sought to form a disinterested special committee to manage the agreements with PR1. [JAF_40] And he demanded visibility and control over APB's finances as the company's CEO. [JAF_40]

Nothing changed. Lee refused to implement the requested financial controls and continued to direct transfers to Puerto Rico over Smith's objection. [JAF_41-43] When Smith told APB's Board members that the company needed to pay an outstanding tax liability of $440,000, Pallas told Smith: "Don't major in the minors." [JAF_44] Then, on or about November 26, 2019, after Smith again reiterated the need for financial controls, Lee told Smith to resign or else he would be fired. [JAF_45] APB never implemented the controls, transparency, and special committee demanded by Smith, and Lee never ceded control over APB's finances. [JAF_46] Smith noisily resigned from APB in May 2020. [JAF_47]

## G.  Compensation to Lee, Pallas and Rice

APB could not find the money to pay the taxes [JAF_98-114], consistently make payroll [JAF_119], keep the lights on at Urban Pharms [JAF_117], pay for porta potties for employees [JAF_121-122], complete acquisitions and obtain licenses [JAF_143, 185, 190, 197], complete an audit [JAF_77], or pay investors [JAF_246, 312, 375, 434]. But the influx of $50 million in investor funds allowed Lee, Pallas, and Rice to take care of themselves notwithstanding APB's tens of millions in operating losses.

Lee received compensation from APB of $1.97 million plus 23,760,00 shares of APB stock and a secured $750,000 note; Rice received compensation from APB of $956,000 plus 1,800,000 shares of APB stock for his 2.5 years of work; and Pallas received compensation from APB of $832,460 and 3,144,688 shares of APB stock. [JAF_48, 51-52] This compensation far exceeded industry norms, especially

considering the size and scope of APB's operations and its operational losses. [JAF_53] Lee's 2022 compensation of $465,550 constituted 47% of APB's total revenue for the year of $957,725. [JAF_50] Moreover, APB apparently never reported Lee's $1.97 million in compensation to the IRS, and Lee's personal tax returns do not identify any APB-related compensation. [JAF_55-57] Lee also misrepresented his APB compensation to at least one investor and to a court when testifying under oath. [JAF_58]

Lee additionally had his personal expenses paid by APB. APB paid for Lee to live in San Juan, Puerto Rico, for multiple years, from mid-2017 through a substantial part of 2021—ostensibly so that APB could establish operations in Puerto Rico. [JAF_60] The company paid hundreds of thousands of dollars for Lee to live at the Vanderbilt Hotel in San Juan, Puerto Rico, a luxury beachfront resort. [JAF_61, 74] The company then paid for Lee to live in three different condominiums. The condominiums cost $8,000-$10,000/month including expenses. [JAF_62] At least two of the condominiums were steps from the beach, and one was listed for sale at $2.475 million. [JAF_63] APB separately paid $3,400/month for Lee to enjoy a personal chef and cleaner. [JAF_64]

Lee lived with a girlfriend in Puerto Rico, and APB paid for the two to travel together.[3] [JAF_71-72] APB also paid for the air travel of relatives of Lee's girlfriend, including her children and grandchild, as well as expenses for Toys R Us, Macy's, Pandora, Jimmy Choo, and spas and wellness treatments. [JAF_72, 74] The spas and wellness treatments alone totaled tens of thousands of dollars. [JAF_74] Lee also received at least $168,000 in petty cash during his time in Puerto Rico. [JAF_74]

---

[3] Pallas testified that the company paid for the travel expenses of Lee's girlfriend because she provided companionship to Mr. Lee. [JAF_73]

**PART II: DEFENDANTS' MISSTATEMENTS AND OMISSIONS IN CONNECTION WITH SECURITIES OFFERINGS**

Defendants raised money through four offerings with false and misleading statements and deceptive conduct. Below are the facts in connection with those offerings.

**A.     Initial Offering And Defendants' Misstatements, Omissions, And Deceptive Conduct To Raise Money**

1.     Background

From at least March 2017 through early 2019, Lee, Rice, and APB solicited debt and stock investments from several individuals and investor groups. Investors typically were offered an APB promissory note that, at the investor's option, could be converted to APB stock. [JAF_238] The largest investor group was known as "Skipjack," and investments by the Skipjack group alone totaled $17.5 million. [JAF_239] APB asked investors, including those in the "Skipjack" group, to make additional investments and, in some cases, to convert their promissory notes into APB stock. [JAF_240]

In connection with the solicitations, Lee and Rice, and those working for them, created and disseminated financial statements and power point presentations, referred to as "pitch decks." [JAF_241-242] Lee, Rice, and APB claimed that the money would be used for APB, including to expand operations, and to fund Urban Pharms and TSL. [JAF_287-288] APB defaulted on debt payments to investors in the Initial Offering no later than October 2019. [JAF_246]

2.     Misrepresentations and Deceptive Conduct in Connection with the Initial Offering [Lee, Rice, APB, Urban Pharms, and TSL]

Lee, Rice and APB, on behalf of APB, Urban Pharms and TSL, made and disseminated numerous false and misleading statements in connection with the Initial Offering and otherwise engaged in deceptive conduct as set forth below.

a.     *Misrepresentations Regarding Company Assets*

Lee, Rice and APB told investors that APB was "vertically integrated" and

had assets in Puerto Rico, Colorado, and in another Oregon property known as Sunfire Farms. [JAF_248-256] These claims were false.

First, with respect to Puerto Rico, Lee, Rice and APB told investors that PR1 was part of "APB CURRENT OPERATIONS" and that APB/PR1 had cultivation sites, a processing facility, "300 acres of licensed cultivation," a "production joint venture," and "[f]our licensed dispensary locations" in Puerto Rico with "infrastructure to scale to fifty dispensaries." [JAF_248, 252-253] Pitch decks further state that APB was "already vertically integrated" in Puerto Rico, and PR1 had "completed 4 asset acquisitions as of March 2018." [JAF_249, 250, 253] Lee separately emailed one substantial investor that APB had "300 acre Cultivation [Puerto Rico] now," an exclusive right in Puerto Rico to 2,700 acres for "Cannabis & Hemp Cultivation and Export now," a $500 million purchase order for 1,000,000 lbs. of marijuana, and cultivation acres "ready to go" in Curacao with "Aruba right behind." [JAF_254]

Both Lee and Rice knew and understood—as they admitted in deposition— that APB did not have an ownership interest in PR1 and did not have any marijuana assets, operations or licenses in Puerto Rico. According to Lee, APB did not move forward with acquiring a stake in PR1 because: (1) APB wanted a majority interest in PR1 that would require a change in Puerto Rican law; (2) current Puerto Rican law (which Lee unsuccessfully lobbied to change) made cultivating outdoor cannabis uneconomic due to taxes and security requirements; and (3) the law needed to change to permit adult-use, recreational marijuana, in addition to medical marijuana. [JAF_145-146] Per Lee, the PR1 transaction did not go forward because it was "in everybody's best interest not to break the law." [JAF_145] Rice also knew that any transaction to acquire PR1 raised "significant issues related to Puerto Rican law." [JAF_147] He further knew that the PR1 acquisition required additional capital that never was provided. [JAF_148-149]

The statements otherwise were fantastically false. PR1 never had any

purchase order for cultivated marijuana—let alone a $500 million purchase order. [JAF_151] PR1 never owned or leased any land for cultivation, never obtained a cultivation license, never cultivated marijuana, and never was vertically integrated. [JAF_153-156] PR1 did not have infrastructure to scale to 50 dispensaries and had not "completed 4 asset acquisitions as of March 2018." [JAF_161] Instead, Castro purchased three dispensary sites with LLCs owned by him; PR1 did not purchase them. [JAF_161] Nor did PR1 ever have any right to a "300 acre Cultivation" or to 2,700 acres for growing cannabis and hemp. [JAF_157-159] PR1 also did not have any license for any dispensary location at the time. [JAF_164] And neither APB nor PR1 ever had any agreements for marijuana cultivation in Curacao or Aruba. [JAF_173-175]

Regarding Colorado, Lee, Rice and APB told investors that APB was "already vertically integrated" in Colorado and had "CURRENT OPERATIONS" in Denver, including "6 Retail facilities, Production facilities, Extraction Business." [JAF_251-253] Pitch decks further state that APB had $22 million (CAD) in revenue for 2017. [JAF_252-253] The representations make sense only if APB were including the revenue and assets of a cannabis company called Winkanda, LLC dba Mindful ("Mindful") and accordingly owned Mindful's dispensaries, cultivation, and manufacturing/production in Colorado. [JAF_180-182, 256] But APB had executed only a term sheet for a NEWCO to acquire Mindful for $40 million; APB could not acquire Mindful consistent with Colorado law. [JAF_182-183] APB signed the term sheet in July 2018 and then abandoned the transaction after receiving diligence, without ever signing the required definitive Purchase Agreement. [JAF_184-185] Lee and Rice knew and understood that the transaction never closed. [JAF_186-187]

Finally, for Sunfire Farms, investor materials claimed that Sunfire Farms was part of APB's "CURRENT OPERATIONS" and that APB was "[p]reparing to plant" marijuana at Sunfire Farms. [JAF_250] But APB never fully funded and never closed on this transaction either. [JAF_190]

### b.    _Misrepresentations Regarding APB's Financial Condition_

Lee, Rice and APB told investors that APB had achieved revenue in 2017 of either $8.1 million, $8.2 million, or $10 million. [JAF_260-261, 263-264] They also disseminated a slide deck in late November 2017 projecting that APB would achieve revenue of $16 million for the year. [JAF_257] Those statements were false, and the projection lacked any foundation in fact. [JAF_258] APB admits that its 2017 revenue was $4.4 million, with an EBITDA loss of ($8.7 million). [JAF_79]

To create the false revenue numbers, Lee instructed APB's Controller, Lee Patin, to run reports showing unsold inventory and "biological assets"[4] as revenue.[5] [JAF_268] For example, after the President of Urban Pharms observed that APB's supposed revenue for 2017 was "a pretty rich number" and "[l]ike close to double reality," Patin responded: "Robby [Lee] wanted me to add this number in Biological Assets for the investors to see and the Shake/Trim per Brian … will be sold at $900 @ 2,000lbs so I added 1.8M for actual Revenue…. " [JAF_262] Rice knew the numbers included biological assets. [JAF_265]

Under GAAP and APB's accounting policies (which adopt GAAP), unsold inventory and biological assets may not be considered revenue. [JAF_269, 272] The investment pitch decks do not disclose that the 2017 revenue numbers included unsold inventory and biological assets.

### c.    _Misrepresentations Regarding General Wesley Clark_

Lee, Rice, and APB repeatedly told investors in the Initial Offering that General Wesley Clark was part of "APB Leadership" and its "Executive Team," serving as APB's "Chief Humanitarian and Global Economic Advisor." [JAF_274-

---

[4] "Biological assets" refers to living plant that is grown and ultimately harvested. [JAF_269]

[5] Financial statements provided to the Stonecrest investors state that APB had an unrealized gain on biological assets of $1.6 million for 2017. Lee and Rice accordingly mostly relied on unsold inventory to arrive at their (false) numbers.

279] One pitch deck specifically touts General Clark as: "Retired four-star general, US Army. Former Supreme Allied Commander, Europe, NATO. Former Democratic U.S. Presidential Candidate (2004 Primary). Advisor to The Blackstone Group, numerous corporate boards." [JAF_275] The materials further note that "General Clark is internationally regarded for his expertise in global issues" and is a "sought after contributor by the world's largest networks." [JAF_275]

But General Clark was not involved with APB and not part of its "Leadership" and "Executive Team." [JAF_281] General Clark previously had been a board member of APB's predecessor, the Grilled Cheese Truck, Inc., but resigned in 2016 when the company shifted its focus to marijuana. [JAF_280] At no time after his resignation did General Clark ever agree to serve in a managerial or advisory capacity to APB. According to General Clark's sworn declaration, any involvement with a cannabis company would have been incompatible with General Clark's military service and interfere with other work. [JAF_282]

Lee and Rice both knew that General Clark was not involved with APB and did not want to be involved. In fact, Lee testified that he asked General Clark to resign from APB's board of directors after the company shifted its focus from grilled cheese trucks to marijuana because General Clark is "a significant figure, and cannabis is so controversial." [JAF_284] According to Lee, "[i]t wasn't safe for him or safe for us." [JAF_284] Moreover, on December 19, 2017, after receiving an investor inquiry about his involvement with APB, General Clark emailed Rice: "Bernie, please correct this the right way. I'm not on the board, nor am I [an] advisor." [JAF_285] Rice admitted receiving this December 19, 2017, email in deposition. [JAF_285] Rice testified that General Clark called him after sending the email, further admonishing Rice that he did not want "to be painted with the cannabis brush." [JAF_286] Lee, Rice and APB nonetheless continued to disseminate pitch decks touting General Clark's "Leadership" and "Executive" roles at APB.

### d. *Misrepresentations Regarding Use of Investor Funds*

Term sheets that Lee, Rice and APB disseminated with pitch decks claimed that APB would use investor funds to expend cannabis operations and for working capital. [JAF_287] They did not disclose that investor funds enabled APB to pay Lee, Pallas, Rice, and Patin above-market compensation when the company was losing tens of millions of dollars [JAF_53], or that investor funds enabled APB to pay for Lee's personal expenditures in Puerto Rico, including health spas, luxury condominiums, travel for his girlfriend, travel for his girlfriend's family, restaurants, groceries, clothing, and $168,000 in petty cash. [JAF_74]

## B. **Stonecrest Offering And Defendants' Misstatements, Omissions, And Deceptive Conduct To Raise Money**

### 1. Background

In April 2019, APB engaged Stonecrest Capital Markets, Inc. ("Stonecrest"), a securities broker-dealer, to sell secured convertible notes. [JAF_289] The Stonecrest Offering commenced on July 26, 2019, and continued until November 15, 2019. [JAF_290] Stonecrest offered the notes exclusively to residents of Puerto Rico. [JAF_291] The notes paid 10% interest per annum, with payments due quarterly, and could be converted to APB common stock at the election of the investor for $1 per share. [JAF_291] The notes purported to be secured by a first priority pledge of the membership interests of Urban Pharms and DJ&S. [JAF_292] APB and Stonecrest sought to raise up to $30 million from accredited investors, with no required minimum raise. [JAF_293]

APB prepared the marketing materials for the Stonecrest Offering, consisting of an introductory letter signed by John Randolph, the CEO of Stonecrest ("Introductory Letter"), a slide deck summarizing investment highlights ("Stonecrest Offering Slide Deck"), and a private placement memorandum ("Stonecrest PPM"). [JAF_296, 298, 300] Lee reviewed the marketing materials. Lee transmitted and/or was copied on various drafts of the marketing materials, provided edits and

16

comments to the documents, and approved drafts of the Stonecrest Offering Slide Deck. [JAF_296, 302-303] Lee additionally disseminated the marketing materials to at least one potential investor and used the Slide Deck in discussions with potential investors. [JAF_304-305] After the Offering, Lee emailed investors at least two letters. [JAF_308-309]

APB ultimately raised $3,276,000 from 46 investors. [JAF_310] APB promptly defaulted on its quarterly payment obligations by the second quarter of 2020 and failed to pay the face value of the notes when they became due on August 31, 2021. [JAF_312] APB now has missed 15 quarterly payments, meaning APB currently owes Stonecrest investors at least $1.2 million ($81,900 quarterly payment x 15 missed quarters), plus the $3.276 million face value of the notes (or more than $4.5 million in total). [JAF_313]

2. <u>Misrepresentations and Deceptive Conduct in Connection with the Stonecrest Offering [Lee, APB, Urban Pharms, and TSL]</u>

Lee and ABP, on behalf of APB, Urban Pharms and TSL, made and disseminated numerous false and misleading statements in connection with the Stonecrest Offering and otherwise engaged in deceptive conduct as set forth below.

a. *Misrepresentations Regarding "Company Assets"*

Lee and APB told the Stonecrest investors that APB had "Company Assets" in Puerto Rico, California, and Oregon. With respect to Puerto Rico, the supposed "Company Assets" included:

- "5 Licenses" for marijuana-related uses;
- "Owned real estate for three dispensaries";
- "a 300-acre grow with supply contracts in place";
- "300 acres of licensed cultivation";
- "current access to over 400 acres upon which to grow";
- "Experienced growers and proven strains"; and
- a marijuana "Production Joint Venture."

17

[JAF_316] In communications to Stonecrest investors on May 29, 2020 and August 31, 2020, Lee additionally told investors that PR1 was a "subsidiary" of APB, that "[w]ith our current outdoor capabilities (License, Land, and experience in hand) we are in the lead position to grow more legal cannabis than all current suppliers combined," and that "[t]oday we are the only licensed, experienced legal outdoor grower on the island." [JAF_317]

But PR1 was not and never has been a "subsidiary" of APB, and APB had none of the described assets. [JAF_142-143] The statements were false even assuming the counterfactual that APB had, in fact, obtained an equity interest in PR1 so that the PR1 assets might be considered APB's "Company Assets." PR1 did not have any cannabis licenses at the time, let alone five; PR1 obtained its first (and only) license in February 2020, a dispensary license, long after the Stonecrest Offering. [JAF_164] PR1 did not have "300 acres of licensed cultivation." [JAF_157] PR1 neither owned nor leased any land for cultivation [JAF_154], and PR1 never obtained a cultivation license. [JAF_163] PR1 did not have any growers, let alone "[e]xperienced growers," and PR1 had not developed any "proven strains." [JAF_167-168] Moreover, there was never any "production joint venture." [JAF_169]

With respect to Oregon, Lee and APB falsely told investors that Sunfire Farms was an APB "Company Asset." [JAF_318] In fact, APB had not closed on the transaction to acquire Sunfire Farms and never would. [JAF_190, 193]

Lee and APB also falsely represented that the Oregon Farm was "[a] 275-acre licensed farm" and a "275-acre built out and active farm w/greenhouses & outdoor, fully licensed, prime Southern Oregon location." [JAF_319] Further, according to investor materials, APB was "one of the largest operators in the U.S.," and Lee emailed investors that APB was "the largest distribution and cultivation company in the market." [JAF_317, 321]

These, too, were lies. The Oregon Farm was (and is) primarily used for cattle grazing. [JAF_32] At the time of the Stonecrest Offering, Urban Pharms had one license for outdoor cannabis cultivation, permitting a canopy of 40,000 square feet (less than one acre). [JAF_28, 30] The fenced area for Garden 1 totaled 12 acres at most, with no more than 5 acres for growing crop, and the total area for all cannabis operations consisted of 20 acres or less. [JAF_27, 31] The Oregon Farm was not a "275-acre licensed farm" or "fully licensed," nor did it have "275-acre[s] built out" for cannabis. And Urban Pharms was not one of the "largest operators in the U.S." [JAF_389-390] Urban Pharms was not even one of the largest operators in Oregon by the time of the Stonecrest Offering. [JAF_390]

With respect to California, Defendants told investors that APB had either eight or nine licenses for cannabis-related operations in California. [JAF_323-324] But APB had no licenses. [JAF_197, 201]

Finally, Lee and APB told investors that APB was a "vertically integrated, multi-state operator[]" [JAF_321], with "5 years very hands on experience in Marijuana…dispensaries from start up to profit." [JAF_317] But APB never owned and/or operated any dispensary, which would be required for vertical integration; it certainly had no experience taking "dispensaries from start up to profit." [JAF_13] Further, APB only operated in Oregon. [JAF_12] APB was not (and never has been) a "multi-state operator."

### b.    *Misrepresentations Regarding Security/Collateral*

An investment in the Stonecrest Offering was a speculative one: APB conducts a federally illegal marijuana business and, at the time of the Stonecrest Offering, had no history of profitability and tens of millions of dollars in operating losses. [JAF_325] Defendants attempted to mask the speculative nature of the investment, and make the investment falsely appear to be safe, by telling the Stonecrest investors that they had a "senior" security interest in real estate (the Oregon Farm) and in the membership interests of Urban Pharms and DJ&S.

[JAF_326-329]

But the Stonecrest investors never obtained the promised deed of trust in the Oregon Farm, nor did they otherwise receive a "senior" security interest. [JAF_333-334] They instead received only a junior lien against the membership interests of Urban Pharms and DJ&S that was subordinate to that of a lender known as Knighted Services, Inc. ("Knighted"). [JAF_335] Knighted had loaned $3.5 million to APB just prior to the Stonecrest Offering. [JAF_330] On behalf of APB, Lee signed documents dated May 22, 2019, providing Knighted with the first deed of trust to the Oregon Farm and the senior security interest in 100% of the membership interests of Urban Pharms and DJ&S. [JAF_332] Lee understood that Knighted had the first deed of trust and the senior interest in the membership interests of Urban Pharms and DJ&S when he signed the agreements. [JAF_336]

Lee and APB undertook other deceptive acts to make the speculative investment appear safe. They provided Stonecrest with a draft slide deck showing that Urban Pharms had a value of $258 million CAD, or about U.S. $200 million. [JAF_338] And Lee told Stonecrest that Urban Pharms had a value of $400 million and that the Oregon Farm had a value of $200 million. [JAF_339] In an email to Stonecrest's lead broker, Enrique Pascual, an APB consultant forwarded a purported valuation showing that Urban Pharms/Oregon Farm had a value of $216 million. [JAF_341] Lee directed that this valuation be sent to Stonecrest and was copied on the email. [JAF_341] Lee understood that Stonecrest would share the $216 million valuation with potential investors. According to Lee, he did not send Pascual the $216 million valuation "for nighttime reading." [JAF_342] Stonecrest also understood that APB had forwarded the purported valuation so that Stonecrest could share it with potential investors. [JAF_343] Stonecrest thereafter circulated the $216 million valuation to dozens of potential investors. [JAF_343]

Neither Urban Pharms nor the Oregon Farm had a value approaching $200 million, let alone $400 million. Stephen Roach, an appraiser retained by the SEC,

determined that the value of the Oregon Farm never exceeded $8.1 million at any point in time from 2017-2023. [JAF_232] Lincoln Eckhardt, an expert in valuing cannabis businesses, concluded that APB's Oregon subsidiaries never had a value greater than $36 million. [JAF_236] Defendants did not submit expert reports rebutting Roach and Eckhardt and did not possess contrary information at the time of their statements. [JAF_233, 237] According to the Stonecrest PPM, APB acquired Urban Pharms, DJ&S, and the Oregon Farm in September 2016 for total consideration of $7.6 million. [JAF_205] Thereafter, as of the Stonecrest Offering, they had made far less than $2 million in improvements to the Oregon Farm. [JAF_35] A document created by Lee in March 2017 pegged the value of the Oregon Farm at $11.7 million, not $200 million. [JAF_214] And APB's internal accounting put the value of the Oregon Farm at $3.65 million, largely consistent with a third-party valuation prepared by Bay Valuation Advisors ("BVA"), dated April 19, 2018, valuing the Oregon Farm at $3.53 million as of September 2016. [JAF_209, 215] The BVA report was circulated to Lee and Pallas, among others, prior to the Stonecrest Offering. [JAF_211-212]

Soon after the Stonecrest Offering had concluded, in January 2020, an APB-commissioned appraisal set the value of the Oregon Farm at $17 million. [JAF_222] APB and Lee did not inform Stonecrest or the Stonecrest investors that this APB-commissioned valuation was $199 million less than had been represented to them, including in subsequent communications sent by Lee to Stonecrest investors in May 2020, August 2020, and September 2021. [JAF_307-309] To the contrary, Lee told Stonecrest investors in correspondence sent September 10, 2021, that Urban Pharms could be valued at "close to $100 million today." [JAF_346]

The $216 million valuation that Lee had forwarded to Stonecrest was prepared by Jon Zimmerman. [JAF_216] Zimmerman's $216 million valuation was a hypothetical valuation to determine what the value of the going-concern business might be if hypothetical investments were made, all necessary licenses were

obtained, and 196 of the Oregon Farm's 275 acres were dedicated to marijuana cultivation and planted. [JAF_218] He did not consider the "as is" value at the time of the Stonecrest Offering, *i.e.*, he did not consider the actual situation where just one outdoor license had been obtained and just five acres of outdoor crop had been planted, not 196 acres. [JAF_219]

Lee knew that Zimmerman's valuation was a hypothetical one. Lee told one individual that Zimmerman's valuation was "based upon federal legalization and maximizing full capacity." [JAF_344] Lee omitted these facts in touting the supposed security presented by the Oregon Farm to Stonecrest and the Stonecrest investors. [JAF_345]

### c.    *Misrepresentations and Omissions Regarding APB's Financial Condition*

In his May 2020 and August 2020 letters, Lee told the Stonecrest investors that APB was profitable, achieving $6.5 million EBITDA in 2019. [JAF_347] In fact, neither APB nor its subsidiaries were profitable. APB lost ($6.8 million) in 2019, Urban Pharms lost ($29,380) and TSL lost ($1.2 million). [JAF_79-83] Lee otherwise omitted disclosing the company's adverse financial situation, including significant unpaid payroll tax liability [JAF_100-105], the company's inability to pay payroll taxes in the second, third, and fourth quarters of 2019 [JAF_102], the inability timely to pay Urban Pharms' operating expenses [JAF_116-118], the fact that, by mid-2019, APB no longer could afford to pay Rice, its former CFO [JAF_22], and that APB reportedly would "go under" without the Knighted bridge loan in May 2019. [JAF_331]

### d.    *Misrepresentations Regarding General Clark*

Lee and APB again (falsely) touted General Clark's involvement to Stonecrest, including by circulating pitch decks showing General Clark as a member of APB's "Advisory Team" (although the final version of the slide deck omitted any mention of General Clark). [JAF_349-351] Lee even sent an email to Randolph

22

stating that the Investor Slide Deck should include General Clark. [JAF_352] As detailed above, General Clark was not involved with APB. [JAF_281-286]

## C.    **$5 Million Raise And Defendants' Lies And Omissions To Raise Money**

### 1.    Background

From 2021 through April 2022, Lee, Pallas and APB again attempted to raise money through secured convertible debt. [JAF_353] This 2021-2022 offering touted a loan opportunity with a two-year term and 10% investment return, paid quarterly, secured by a "first deed of trust" on the Oregon Farm, with the loan convertible to APB stock. [JAF_356, 359, 365]

More specifically, the investment involved selling membership interests in an entity created by Lee, Pallas and APB known as "APB Real Estate Holdings, Inc." (hereafter, "APB RE Holdings"). [JAF_355] APB RE Holdings, in turn, was to obtain the "first deed of trust" on the Oregon Farm, and APB was to retain investor funds in escrow until APB RE Holdings had obtained the first deed of trust. [JAF_356, 358] Per the investor materials, APB was to issue a two-year note and pay investors the 10% return on a quarterly basis; however, Defendants have not produced any evidence of notes formalizing this obligation. [JAF_359-360] Defendants initially offered to raise $10 million in debt, or $8 million, before finally telling investors that they sought to raise $5 million. [JAF_362] Lee and Pallas circulated promotional materials to potential investors, including pitch decks, and personally solicited investors by email. [JAF_363-364] They also published an advertisement in Investor's Business Daily and made a promotional video in which Lee appears. [JAF_366-367]

In total, APB raised $2.485 million, less than the $5 million objective, from 19 different investors in the United States. [JAF_371] Clyde Clifford brokered most of the investments on behalf of APB. [JAF_372]

APB defaulted on payments to investors and has not repaid the loans (and there is no record evidence of any notes to investors memorializing the promised

debt obligation). [JAF_375] APB released investor funds from escrow to itself without any of the investors obtaining the promised first deed of trust (either directly or indirectly through APB RE Holdings). [JAF_376]

2. <u>Misrepresentations and Deceptive Conduct in Connection with the $5 Million Raise [Lee, Pallas, APB, Urban Pharms]</u>

Lee, Pallas and ABP, on behalf of APB and Urban Pharms, made and disseminated numerous false and misleading statements to investors in connection with the $5 Million Raise.

a. *Misrepresentations Regarding Supposed Puerto Rican Assets*

Like the Stonecrest Offering, Lee, Pallas and APB falsely informed investors that APB had actual marijuana assets in Puerto Rico when APB had no such assets. The false statements made to investors included the following:

- "American Patriot Brands currently has cultivation in Puerto Rico under construction";
- "APB Owned Assets" in Puerto Rico expected to generate $60.3 million in 2022;
- "Cultivation construction has begun" [Ex. 399];
- "Outdoor cultivation field currently under construction";
- APB has "come to agreements for our own 10 acres (net beginning) outdoor, and also indoor and processing" [Ex. 399]
- "Have the infrastructure to grow to 50 franchise locations" and "Scalable to Fifty dispensaries"; and
- "5 licenses in hand."

[JAF_378-381] Again, APB never had any assets in Puerto Rico. [JAF_142-143, 177-178] PR1 did not have any of the described assets either. [JAF_151-170]

Lee spread the false statements about the purported Puerto Rican assets even after John Randolph, the CEO of Stonecrest, had expressly warned Lee that the statements were misleading. In a January 29, 2020, email to Lee, Randolph wrote:

24

I understand, respect and trust your word that APB has the right to own, or can own at any time with the stroke of a pen, 40% (or some other percentage) of PR1. However, I do not see evidence that APB does currently own any percentage of PR1. Can we clear this up? **Make it official in some way that matches the representations made to the investors?** ….

Important: The Investor Deck talks a lot about Puerto Rico.

[JAF_382] (bold font added).

### b.    *Misrepresentations Regarding Oregon Assets*

Lee, Pallas and APB also told investors that the Oregon Farm was "[a] 275-acre licensed farm" and a "275-acre built out and active farm w/greenhouses & outdoor, fully licensed, prime Southern Oregon location." [JAF_384] They did not tell investors that Urban Pharms had just one outdoor license permitting a marijuana canopy of less than one acre, and that the total cultivation area consisted of about five acres, not 275 acres. [JAF_27, 31] They further told investors in connection with the $5 Million Raise that "Urban Pharms is one of the largest legal marijuana farms, not just in Oregon or California, but in the country." [JAF_385] Lee acknowledged that this statement was based on the total acreage of the Oregon Farm, most of which is dedicated to cattle grazing, not the actual acreage dedicated to marijuana. [JAF_387] Lee, Pallas, and APB never alerted investors to this qualification. [JAF_387] Moreover, the traditional indicators of size of a marijuana operation are (1) the licensed grow canopy, (2) the quantum of cannabis produced, and (3) the revenue generated. Urban Pharms was not "one of the largest legal marijuana farms" under these metrics. [JAF_390]

Lee knew that Urban Pharms was not "one of the largest legal marijuana farms"—hence his deposition testimony that the statement concerned the gross acreage of the Oregon Farm. In addition, in December 2019, Seth Marsh, then the head grower at the Oregon Farm, had emailed Lee and specifically advised him that Urban Pharms was "competing [in Oregon] against companies with six, twelve and

even 19 production licenses." [JAF_388] Urban Pharms had only one outdoor production license and one indoor production license. [JAF_26, 28, 30]

          c.      *Misrepresentations Regarding Security/Collateral*

Lee, Pallas and APB trumpeted the supposed security and collateral for the $5 Million Raise: a "first lien, senior secured position on APB's 275 acre [Oregon Farm]." [JAF_394] They told investors that their investment would have a loan-to-value (LTV) of 29% considering the $17 million appraised value. [JAF_393] And they told investors that they would have the "SECURITY OF 1st Trust Deed." [JAF_395] Lee stated in the promotional video: "It's just like a mortgage on your home or your real estate. We're giving a first trust deed for security, your collateral, on this farm. It's a very low loan to value ratio. So the safety of the, I'll call it the investment, or the loan is certainly there." Lee continued: "If you're investing $100,000 the investment goes into an escrow account, and then once the trust deed, the security is delivered, then the money flows to the company. So the investor has that absolute confidence and peace of mind that it's a collateralized, protected investment. So we are pledging our most precious asset, this farm, as collateral." [JAF_396] Lee, Pallas, and APB further told investors that the 10% interest payments were "GUARANTEED." [JAF_395]

But there was no "guarantee," and investors did not receive a first trust deed. The title evidence establishes that Knighted held—and continues to hold—the first trust deed to the Oregon Farm. [JAF_397-398] APB also did not hold the funds in escrow until the issuance of a first trust deed, as promised. APB instead took the money and then defaulted on its payment promises. [JAF_375-376] APB has not repaid the loans it received from investors. [JAF_375]

          d.      *Misrepresentations and Omissions Regarding APB's Financial Condition*

Lee, Pallas and APB told investors that APB was a profitable company: "APB FINANCIALS [—] CURRENT BALANCE SHEET & PROFITABLE INCOME

STATEMENT AVAILABLE FOR REVIEW UPON REQUEST." [JAF_404] But contrary to the marketing materials, APB did not have a "profitable income statement." Lee, Pallas, and APB failed to tell investors that the company had suffered millions of dollars in annual losses, including a net loss of ($13.9 million) in 2017, a net loss of ($19.7 million) in 2018, a net loss of ($13.6 million) in 2019, and a net loss of ($3.7 million) in 2020, the most recent year. [JAF_80]

Further, Lee, Pallas and APB failed to tell investors that APB had defaulted on paying the Stonecrest investors and had defaulted on paying Knighted. Both Knighted and the Stonecrest investors had (and have) security interests in the membership interests of Urban Pharms and DJ&S, and could have foreclosed (and still can foreclose) on those security interests, depriving APB of revenue to pay investors in the $5 Million Raise. [JAF_406] Lee, Pallas and APB otherwise did not alert investors to APB's rash of financial difficulties in 2021, including $800,000 in unpaid payroll tax liability as of June 1, 2021, the failure to pay other taxes, including Oregon State income and local property taxes, efforts by Knighted and the SkipJack investors to have receivers appointed to take control of the APB assets, the need for Lee's mother to provide $40,000 for Urban Pharms to make payroll, the inability to pay for porta potties for Urban Pharms' employees, and the company's inability to pay its COO and Controller. [JAF_104, 107, 109, 121-122, 127-132]

**D.** **The Garden Unit Offering And Defendants' Lies And Omissions**

  1. Background

Soon after the $5 Million Raise, beginning in May 2022, Lee, Pallas, APB and DJ&S commenced the Garden Unit Offering. [JAF_426] Clyde Clifford, a real estate agent at Lee & Associates, worked with Lee and Pallas on the offering and led the sales effort. [JAF_425-430]

The Garden Unit Offering involved selling membership interests in two entities created by Lee and Pallas: Value Properties I, LLC ("VP1") and Value Properties II, LLC ("VP2"). [JAF_408] Lee and Pallas had DJ&S, the corporate

owner of the Oregon Farm, lease the Oregon Farm's approximately 10-acre, fenced Garden 1 to VP1 for a 99-year term and lease the Oregon Farm's approximately 10-acre, fenced Garden 2 to VP2 for a 99-year term. [JAF_411] Lee signed the lease agreements on behalf of DJ&S; Pallas signed the lease agreements on behalf of VP1 and VP2 as their managing member. [JAF_412] VP1 and VP2 each agreed to pay DJ&S whatever amount was raised as part of the Garden Unit Offering, not to exceed $7.5 million, for the 99-year lease term. [JAF_413] At the same time, Lee and Pallas had VP1 and VP2 sublease Gardens 1 and 2 to Urban Pharms. [JAF_414] Lee signed the subleases on behalf of Urban Pharms; Pallas signed the subleases on behalf of VP1 and VP2. [JAF_414] Per the subleases, Urban Pharms agreed to pay base rent to VP1 and VP2 of $750,000 per annum, increasing 3% each year, plus all taxes, insurance and other costs, plus percentage rent of 2% of gross sales. [JAF_415]

Lee, Pallas, APB, DJ&S, and Urban Pharms offered and sold 30 "units" in VP1 and VP2, respectively, for $250,000 per unit, or $7.5 million for all the units in either VP1 (the "Garden 1 Units") or VP2 (the "Garden 2 Units") (collectively, "Garden Units") ($250,000/unit x 30 units = $7.5 million). [JAF_417] They also offered and sold fractional interests in each Garden Unit. [JAF_417] According to the offering materials, interests in the Garden Units would provide investors the right to the "rent" paid by Urban Pharms. [JAF_418] Defendants promised investors that they would receive a 10% return on their investment the first year, with annual increases of 3%, plus 2% of Urban Pharms' gross sales (pro rata). [JAF_419] In addition, as part of the investment opportunity, APB guaranteed the rent payments by Urban Pharms. [JAF_423]

Clifford and other agents of Lee and Associates commenced selling the Garden Units in May 2022, and the offering continued until the filing of this litigation in March 2023. [JAF_426] Clifford prepared two offering memoranda to disseminate to potential investors. [JAF_428] Lee and Pallas provided Clifford with

the facts in the offering memoranda, and they reviewed and approved the final iterations of the offering memoranda before Clifford and other agents disseminated the documents. [JAF_429-430] The offering memoranda were available on the Lee & Associates website, the Crexi commercial real estate website, through LoopNet/CoStar, and on a cannabis-specific website. [JAF_431] Clifford and other agents also shared the offering memoranda by email, including through an email blast to all agents of Lee and Associates. [JAF_432]

The Garden Unit Offering raised a total of $9,375,000 from 27 different investors before ceasing in March 2023. [JAF_433] Urban Pharms and APB then defaulted on their payment obligations to these investors. [JAF_434] Recently, in the Summer of 2024, Defendants sold another 1.7 units to an investor for $425,000. [JAF_435] Lee directed that APB pay this new investor a return versus paying a return to the other investors. [JAF_435]

Lee and Associates received a 15% commission from the raise, or about $1.4 million, of which Clifford personally received around $700,000. [JAF_436] Lee separately had APB pay Clifford an additional $404,500 in 2022, and another $50,000-$60,000 in 2023, and grant Clifford 2.5 million shares of APB stock, although APB had no obligation to make these payments or issue stock to Clifford. [JAF_437]

    2.   <u>Misrepresentations and Deceptive Conduct in Connection with the Garden Unit Offering [Lee, Pallas, APB, Urban Pharms, and DJ&S]</u>

Lee, Pallas, ABP and DJ&S, on behalf of APB, DJ&S and Urban Pharms, engaged in deceptive conduct and made and caused to be disseminated several false and misleading statements to investors in connection with the Garden Unit Offering.

    a.   *<u>Misrepresentations Regarding the Size and Output of Urban Pharms' Operations</u>*

The offering memoranda state that Urban Pharms—the entity paying rent to VP1 and VP2 and the purported source of investor returns—operated "one of the

29

largest legal Cannabis Farms in the US." [JAF_439] The memoranda fail to disclose that the Oregon Farm was "one of the largest Cannabis Farms in the US" only if one were to consider the more than 200 acres then dedicated to cattle grazing. [JAF_441]

The offering memoranda further state that Urban Pharms had a "2021 harvest of more than 24,000 pounds of sun-grown flower" and had "[p]roduced nearly 100,000 lbs of flower since inception." [JAF_442] Those statements were false. "Flower" is a term of art in the cannabis industry and refers to the smokable marijuana buds after they have been trimmed of stems and leaves. [JAF_443] The "flower" is the most valuable part of the marijuana plant, fetching a price that is multiples higher than the price for trimmed leaves, known as "trim." [JAF_444] APB, Urban Pharms, and the industry categorize "flower" into "A buds" and "B buds," with A buds being the larger, more desirable, flower. [JAF_445]

APB and Urban Pharms keep records of the marijuana harvests and, by the time of the Garden Unit Offering in May 2022, knew that the 2021 harvest had yielded less than 4,200 lbs. of flower, not "more than 24,000 [lbs.]." [JAF_450, 454, 461] And contrary to the statements made to investors, Urban Pharms had produced less than 23,000 lbs. of flower from 2016 through 2021, not "nearly 100,000 lbs." [JAF_457] Urban Pharms' harvest yields are summarized in the table below:

### APB's Reported Cannabis Production (In Pounds)[476]

| Year | Sum of Plants | Sum of Wet Lbs | Dry Weight | Biomass | A Bud | B Bud | Total Flower (A Bud and B Bud) | Trim | Other | Total Bud, Trim and Other |
|---|---|---|---|---|---|---|---|---|---|---|
| 2017 | 6,221 | 62,466 | 15,617 | 8,435 | 1,700 | 399 | 2,099 | 3,270 | 0 | 5,369 |
| 2018 | 5,599 | 69,800 | 17,450 | 12,971 | 3,767 | 149 | 3,916 | 8,548 | 969 | 13,433 |
| 2019 | 3,658 | 91,423 | 16,908 | 12,738 | 3,807 | 655 | 4,462 | 6,831 | 1,560 | 12,853 |
| 2020 | 3,516 | 89,843 | 20,664 | 14,487 | 4,924 | 257 | 5,181 | 8,137 | 886 | 14,204 |
| 2021 | 3,824 | 109,598 | 24,692 | 19,565 | 3,565 | 593 | 4,158 | 8,303 | 1,819 | 14,280 |
| Total (2017-2021) | 22,818 | 423,130 | 95,331 | 68,196 | 17,763 | 2,053 | 19,816 | 35,089 | 5,234 | 60,139 |
| 2022 | 3,484 | 89,831 | 20,873 | 16,982 | 4,888 | 830 | 5,718 | 9,435 | 74 | 15,227 |
| 2023 | 9,286 | 152,648 | 32,815 | 27,128 | 4,797 | 1,458 | 6,255 | 19,464 | 41 | 25,760 |

[Declaration of Lincoln Eckhardt, ¶ 8]

The harvest numbers presented to investors were false and misleading even if one were to assume, contrary to industry practice (and the practice of APB and

Urban Pharms) that "flower" refers to the sellable material. Considering all sellable material, the 2021 harvest totaled 14,280 lbs., not more than 24,000 lbs., and the total Urban Pharms' production for 2016-2021 totaled about 63,000 lbs. (60,139 lbs. for 2017-2021, plus another 3,000 lbs. for 2016), not nearly 100,000 lbs. [JAF_458, 460]

These harvest numbers were no secret to Lee and Pallas. Urban Pharms tracks its harvests per Oregon law and otherwise maintains business records of its harvests for business plans and to forecast revenue. [JAF_461] Lee and Pallas regularly requested and received actual and projected harvest totals—including with respect to the 2021 harvest. [JAF_463] In fact, Lee had a memorable meeting with one Urban Pharms' employee, Francesca Ford, on January 14, 2022, regarding the 2021 harvest. Ford had overheard Lee discussing the expected 2021 yield with Kevin Cliame, who had succeeded Marsh as head grower. [JAF_464] Lee and Cliame discussed the outdoor 2021 harvest as having an expected yield of more than 9,000 lbs. of flower. [JAF_464] At the time of the meeting, Urban Pharms was in the middle of processing the 2021 harvest.[6] [JAF_464]

After Cliame had left, Ford discovered a spreadsheet forecasting the 2021 outdoor harvest yield at 9,718 lbs. of flower. [JAF_465] Ford took a picture of the spreadsheet and texted it to Patin. [JAF_465] Ford wrote that Cliame's "projections are 50% off." [JAF_465] Ford then confronted Lee and told him that the outdoor 2021 yield would be less than 5,000 lbs. of flower. [JAF_467] Lee was not happy about being corrected by Ford and yelled at her in anger. [JAF_469] Ford described Lee's anger in contemporaneous texts to Patin. Ford wrote: "He is screaming…. lol I will call you back." [JAF_470] Patin, who overheard Lee screaming over the telephone, responded: "Wow[.] He sounded not happy." [JAF_470]

In the same January 14, 2022, meeting, Ford offered to show Lee the

---

[6] The outdoor harvests are conducted in the October/November timeframe.  The cut plants must dry for a few weeks, and then are processed for sale. [JAF_449]

spreadsheet supporting that the 2021 outdoor crop would yield less than 5,000 lbs. of flower. [JAF_471] Lee responded that he did not care about Ford's spreadsheet. [JAF_471] Lee also told Ford that she should not worry about the yield because the APB stock price soon would be $5/share, and Ford then could retire. [JAF_472]

### b. *Misrepresentations and Deceptive Conduct Regarding Urban Pharms' Financial Performance*

Lee also engaged in deceptive conduct by having false financial statements for Urban Pharms forwarded to Clifford. Lee directed APB's Controller, Lee Patin, to create the false financial statements and then forward them to Clifford. [JAF_475] The fabricated financial statements show that Urban Pharms had revenue of $10.1 million and income from operations of $6.3 million for calendar year 2022. [JAF_476] Previously, Lee and Patin had sent Clifford financial statements showing that Urban Pharms had revenue of $8.1 million and income from operations of $5.9 million through September 30, 2022. [JAF_482] The $10.1 revenue number was consistent with the offering memoranda, which forecast Urban Pharms having $10 million in sales in the first year. [JAF_474]

The numbers provided to Clifford were fantastically false, as was the representation in the later iteration of the offering memorandum stating that "Urban Pharms is a profitable company with more than 57% of the top-line hitting the bottom-line EBITDA." [JAF_484] The marijuana market in Oregon had cratered by 2022, and Urban Pharms' sales had collapsed correspondingly. [JAF_485-487] For 2022, Urban Pharms generated total revenue of just $942,723, with an EBITDA loss of ($2.5 million)—magnitudes less than the presented revenue of $10.1 million and operating income of $6.3 million. [JAF_82] This revenue and operating loss meant that Urban Pharms did not have sufficient revenue to pay the $1.5 million base rent due to VP1 and VP2 ($750,000 for each of Gardens 1 and 2) and the promised investment returns. According to Clifford, the economics of the investment "obviously" did not work where Urban Pharms had less than $1 million in annual

revenue. [JAF_420]

The disseminated financial statements otherwise failed to disclose that APB had defaulted on paying Knighted and the Stonecrest investors and that Knighted and the Stonecrest investors had (and have) security interests in the membership interests of Urban Pharms. [JAF_488] Knighted and the Stonecrest investors could foreclose (and still can foreclose) on those security interests, depriving investors of their ability to receive money from Urban Pharms and a financial return. [JAF_488] The disseminated financial statements and offering memoranda also failed to alert investors to myriad other financial difficulties including the unpaid tax liability of several hundreds of thousands of dollars, the company's inability to make payroll, TSL's default on its office and warehouse leases, and a threatened foreclosure on the Oregon Farm by Jackson County for failure to pay property taxes for three years. [JAF_107-112, 119-121, 128-129]

        *c.*    *Misrepresentations Regarding the Use of Investor Proceeds*

One version of the offering memorandum circulated to investors states that the Garden Unit Offering (referred to as the "syndication") was "for expansion purposes only" and that $10 million already had been raised "for expansion purposes." [JAF_490] This was false. APB and DJ&S ultimately raised $9.375 million from investors but used only a fraction of those proceeds for expansion—a few hundred thousand dollars to add Garden 2. [JAF_491] Defendants intended mostly to profit or pay operating expenses from the sale of the Garden Units, not use the raised money "for expansion purposes only." [JAF_493] Indeed, in a communication with an investor before the Offering commenced, in March 2022, Lee remarked that APB planned to sell each garden interest for $7.5 million, and that it costs approximately $1.5 million to develop an outdoor garden, meaning "the initial profit per garden is approximately $5.5 million before commissions." [JAF_492]

        *d.*    *Misrepresentations Regarding Security/Collateral*

Lee and Pallas told Clifford that the Oregon Farm had a value of at least $100

million—a representation that Clifford touted in his sales pitch to potential investors. [JAF_494-495] That $100 million valuation had no reasonable basis. The value of the Oregon Farm never exceeded $8.1 million before, during, and after the Garden Unit Offering. [JAF_232] Moreover, by the time of the Garden Unit Offering, Lee and Pallas had in their possession an actual appraisal of the Oregon Farm valuing the property at $17 million, and Lee and Pallas used and disseminated that same $17 million appraisal as part of the $5 Million Raise. [JAF_222, 225-227] Other facts demonstrate that the purported $100 million valuation had no reasonable basis. For example, Lee told Patin and separately told Knighted that he was in discussions to sell the Oregon Farm for between $15 to $25 million, with a leaseback to Urban Pharms at market rates. [JAF_223-224] Lee also signed a letter of intent in July 2020 agreeing to sell all of Urban Pharms, TSL, DJ&S, and the Oregon Farm for total consideration of $12.5 million. [JAF_231] In the months following that letter of intent, the Oregon marijuana market collapsed. [JAF_485-487]

## DEFENDANTS' COUNTER STATEMENT OF FACTS

The Defendants will address the facts regarding their alleged conduct in each of its arguments below.

## SUMMARY JUDGMENT STANDARD[7]

"Summary judgment is appropriate when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law." *SEC v. Feng*, 935 F.3d 721, 728 (9th Cir. 2019). The party moving for summary judgment "bears the burden of proving the absence of a genuine issue of material fact." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). If the moving party meets its burden, the burden then shifts to the nonmoving party to "designate specific facts demonstrating the existence of genuine issues for trial." *Id*. The nonmoving party "must come forth with evidence from which a jury could

---

[7] The Defendants agree with this standard.

reasonably render a verdict in the nonmoving party's favor." *Id*. Where the moving party meets its burden and the nonmoving party does not, the court "shall grant summary judgment." Fed. R. Civ. P. 56(a).

# ARGUMENT

## I. SUMMARY OF ARGUMENT

### A. <u>SEC</u>

The SEC seeks summary judgment with respect to Counts I and II of the Complaint alleging violations of Section 17(a) of the Securities Act of 1933 [15 U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder [15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5]. Section 17(a) and Section 10(b) "prohibit fraudulent conduct or practices in connection with the offer or sale of securities." *SEC v. Dain Rauscher, Inc.*, 254 F.3d 852, 855 (9th Cir. 2001). "A violation of Section 10(b) and Rule 10b–5 is established if the defendant (1) made a material misrepresentation or omission (2) in connection with the purchase [or] sale [of a] security (3) with scienter (4) in interstate commerce." *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1092 (9th Cir. 2010). The same elements also establish a violation under Sections 17(a)(1)-(3) of the Securities Act, except that Sections 17(a)(2) and (a)(3) of the Securities Act require only negligence, not scienter. *SEC v. Johnson*, No. 20-cv-8985, 2023 WL 2628678, at *13-15 (C.D. Cal. Feb. 17, 2023).[8]

Defendants do not dispute that they offered securities, [JAF_247, 314, 377, 438], and, as detailed above, Defendants' misstatements and omissions and deceptive conduct were in connection with those securities offerings. In addition,

---

[8] For liability under Section 17(a)(2) of the Securities Act, the defendant also must "obtain money or property by means of any untrue statement of a material fact or any omission." Each of the Defendants obtained money through their false and misleading statements. The Corporate Defendants directly received investor money, and Lee, Pallas and Rice received additional compensation and benefits as a result of investor money.

Defendants utilized the means and instrumentalities of interstate commerce, including by sending communications to investors by electronic mail, posting information to public websites, and marketing securities in a widely distributed publication. The SEC addresses below Defendants': (1) materially false and misleading statements and omissions and deceptive conduct; and (2) scienter.

## B.     Defendants' Response: Summary of Argument

In its opening brief, the SEC alleges that various Defendants committed securities fraud with respect to four separate offerings. In none of the four offerings does the SEC allege all defendants were involved in the alleged fraud. In fact, the SEC alleges that Defendant Rice was involved in only the first offering and that Defendant Pallas was involved in only the third and fourth offerings. The SEC alleges only Defendant Lee was involved in all four offerings. Despite this clear identification of which conduct is allegedly relevant to each Defendant, the SEC often makes its argument regarding a specific alleged misstatement or omission by referring to all the Defendants as being responsible. The five types of misstatements or omissions are: (1) misstatements and omissions concerning company assets; (2) misstatements and omissions concerning security/collateral; (3) misstatements and omissions concerning APB's and Urban Pharms's financial and business performance; (4) misstatements and omissions concerning General Clark's involvement with APB; and (5) misstatements and omissions concerning the use of investors' funds. The SEC does not allege that all Defendants committed fraud relating to all Five misstatements or omissions. The SEC also identifies the four separate offerings to which the fraud applies as: (1) the Initial Offering; (2) the Stonecrest Offering; (3) the Five Million Dollar Raise; and (4) the Garden Units Offering. Because the SEC does not allege that each Defendant participated in these offerings, the effect of using the plural "Defendants" is to conflate and confuse the evidence, or lack of evidence, as it may relate to each Defendant's liability with respect to each separate allegation of securities fraud. This conflation is particularly

unfair to Defendant Rice, who was not an APB employee, who was only part of the

APB operations at the start of the business, and who the SEC alleges only was

involved with APB only at the time of the Initial Offering. It is also misleading as to

Defendant Pallas who the SEC alleges was involved in only the last two offerings.

Such distinctions also are relevant and necessary because the circumstances relevant

to whether each alleged misstatement or omission was, in fact, a misstatement or

omission at the time it was made changed over the seven-year course of this matter

as circumstances related to the state of the business. Accordingly, the Defendants'

opposition will address each Defendants alleged securities fraud with respect to the

specific offering he is alleged to have participated in.[9]

## II.    MISSTATEMENTS AND OMISSIONS REGARDING SUPPOSED COMPANY ASSETS

### A.    SEC's Argument

#### 1.    Defendants Made and Disseminated Material Misstatements

Defendants repeatedly pushed lies to investors about APB's supposed

corporate assets, including (falsely) telling investors that the company had assets in

Puerto Rico and Colorado [JAF_248-254, 315-317, 378-381], that APB was a

"multi-state operator" and "vertically integrated" [JAF_252-253, 321], that APB had

cannabis-related licenses in California and Puerto Rico [JAF_316-317, 323-324,

378, 381], that the Oregon Farm was "[a] 275-acre licensed farm" [JAF_319, 384],

that the Oregon Farm was a "275-acre built out and active farm w/greenhouses &

outdoor [and] fully licensed" and "one of the largest Cannabis Farms in the US" and

Oregon [JAF_319, 322, 384-386, 439], and that APB owned a second cannabis farm

in Oregon known as Sunfire Farms [JAF_250, 253, 318]. In fact, APB never had any

---

[9] In a footnote, Footnote 7, the SEC states that to prove liability under Section
17(a)(2) of the Securities Act, it must prove that the Defendant obtained money
through the fraud. However, it only states, in a conclusory manner that "Lee, Pallas,
and Rice received additional compensation and benefits as a result of investor
money." The SEC offers no evidence to support its claim, and the Court should reject
it.

assets in Puerto Rico or Colorado [JAF_142-143, 177-178, 180], never had any licenses in Puerto Rico or California [JAF_142-143, 197, 201], never closed on the Sunfire Farms acquisition [JAF_190], never had multi-state operations [JAF_12], and never had vertical integration [JAF_13]. Further, the Oregon Farm was not a "275-acre built out" cannabis operation, was not "fully licensed," and was not "one of the largest Cannabis Farms" in Oregon and the United States. The Oregon Farm mostly is (and was) used for cattle grazing, not for marijuana, with the marijuana operations taking place on no more than 20 acres at the time of the misstatements. [JAF_31]

"A statement is material if 'a reasonable investor would have considered it useful or significant.'" *United States v. Jenkins*, 633 F.3d 788, 802 (9th Cir. 2011). This reasonable-investor standard is an "objective one." *Id*.

Defendants' lies about supposed corporate assets had obvious materiality to investors: They created the false impression that APB was a major, multi-state operator, with valuable assets and large-scale operations in place and/or about to commence. Courts repeatedly have held that such misstatements and omissions are material as a matter of law. *See, e.g.*, *Platforms Wireless*, 617 F.3d at 1095-96 (affirming summary judgment for SEC on fraud claims where defendants made material misstatements about non-existing product); *SEC v. AirTrac, Inc*., No. 06-cv-582, 2008 WL 11334597, at *7 (C.D. Cal. Jan. 2, 2008) (granting summary judgment for SEC on fraud claims and observing that "[t]here is no serious dispute" that misstatements about non-existing contracts with major carriers were material); *see also, e.g.*, *SEC v. GenAudio, Inc.*, 32 F.4th 902, 935 (10th Cir. 2022) ("teas[ing] shareholders" about a potential significant business relationship is material); *SEC v. Sethi*, 910 F.3d 198, 207-08 (5th Cir. 2018) (affirming summary judgment for SEC on fraud claims where defendant made misrepresentations about business relationships that did not exist).

2.    <u>Lee, Pallas, and Rice Acted with Scienter</u>[10]

Scienter requires knowing or reckless conduct. *Dain Rauscher*, 254 F.3d at 856. Reckless conduct involves "a highly unreasonable omission" where the danger of misleading investors is "known to the defendant or is so obvious that the actor must have been aware of it." *Platforms Wireless*, 617 F.3d at 1093 (citation and quotation marks omitted).

The undisputed record establishes knowing misconduct: Lee, Pallas, and Rice were the principal officers of APB, serving as CEO, COO, and CFO, respectively, and they pushed blatant falsehoods that they knew to be false. For example, Lee and Rice admitted in deposition that they knew and understood that APB had never acquired any interest in PR1 and therefore had never acquired any interest in any asset in Puerto Rico. [JAF_145-149] (Pallas testified that he did not know whether APB had acquired an ownership interest, but APB's auditors sent an email, copying Pallas, stating that APB did not have an equity position in PR1. [JAF_150]) Lee and Rice also knew and understood that APB had never acquired any interest in Mindful. [JAF_186-187] And Lee and Pallas obviously knew and understood that not all 275 acres of the Oregon Farm were licensed and dedicated to marijuana cultivation. [JAF_20, 27, 322]

The three acted recklessly in all events by pushing obvious falsehoods, such as APB having "cultivation under construction" in Puerto Rico and a $500 million purchase order. The Ninth Circuit's decision in *Platforms Wireless* is on point. The court there affirmed summary judgment for the SEC, finding that defendants had misled investors by asserting that the company possessed a new technology when, in

---

[10] Lee, Pallas, and Rice acted as agents and on behalf of the Corporate Defendants, and their scienter accordingly is imputed to the Corporate Defendants. *In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 476 (9th Cir. 2015) ("[W]e have adopted the general rule of imputation and held that a corporation is responsible for a corporate officer's fraud committed 'within the scope of his employment' or 'for a misleading statement made by an employee or other agent who as actual or apparent authority.'") (citation omitted).

fact, the company had not yet built a prototype and lacked funds to do so. 617 F.3d at 1082. According to the court, this representation was "an absolute and unequivocal falsehood" about an asset the company did not possess. *Id*. at 1095. Scienter followed regardless of defendant's subjective belief that the company easily could acquire a prototype. *Id*. (affirming district court's conclusion that defendants acted with deliberate recklessness because they knew there was no prototype).

Likewise on point is the Tenth Circuit's decision in *GenAudio*, 32 F.4th at 924, where a CEO lied to investors about an imminent business relationship with Apple. The CEO claimed that he believed such a business relationship soon would come to fruition. The court nonetheless found scienter because "[t]he securities laws impose a personal obligation on corporate executives, like [CEO], to sufficiently ground their communications in facts." 32 F.4th at 924 ("[N]o matter how Panglossian their view of the world, corporate executives … cannot make material representations to their shareholders in blatant disregard of obvious facts and be excused by the failures of others to correct their false notions.").

Here, like in *GenAudio*, Lee, Pallas, and Rice acted in blatant disregard of obvious facts including: (1) the absence of any completion or funding of the PR1, Mindful, and Sunfire deals; (2) the actual operations of Urban Pharms and its use of the Oregon Farm; (3) the absence of any California licenses (which easily could have been determined); and (4) the actual facts on the ground in Puerto Rico—e.g., PR1 did not have any cultivation land, let alone "cultivation under construction," and did not have any purchase orders, let alone a $500 million purchase order.[11]

---

[11] As noted above, Lee lived in Puerto Rico from mid-2017 into 2021, purportedly to kickstart APB's and PR1's business in Puerto Rico. [JAF_60] He was the Chairman of PR1, had an employment contract with PR1 providing for an annual salary of $240,000, received $200,000 in compensation from PR1 for performing "a lot of work," and attended business meetings in Puerto Rico. [JAF_134, 138-140, 146] If Lee did not know the true situation—and Lee's partner, Ricky Castro, testified that he told Lee the truth [JAF_165]—then Lee deliberately buried his head in the Puerto (cont'd . . .)

Other decisions are in accord. For example, in *SEC v. Lyttle*, 538 F.3d 601, 604 (7th Cir. 2008), the court affirmed summary judgment for the SEC after finding it "inconceivable that the defendants could have believed the cascade of fantastic lies that they told the investors." And in *AirTrac*, this court granted the SEC summary judgment, finding that the SEC had established scienter as a matter of law where defendants had made "patently false" statements about supposedly impending contracts. 2008 WL 11334597, at *9 ("the Court does not believe that any reasonable person would think that they could tell investors that … major contracts with large companies were imminent when the facts, which the AirTrac defendants were in a unique position to know, made obvious they were not"); *see also Sethi*, 910 F.3d at 207-08 (affirming summary judgment for SEC and finding scienter where defendant falsely touted relationships with major oil companies that did not exist); *SEC v. George*, 426 F.3d 786, 795 (6th Cir. 2005) (affirming summary judgment in favor of SEC and finding scienter where defendant "failed to verify the legitimacy of the investment programs he advertised"); *SEC v. Advance Body Imaging LP*, No. 07-cv-1140, 2009 WL 10673586, at *4 (C.D. Cal. Mar. 18, 2009) (finding scienter and granting summary judgment for SEC where Defendants "consistently sent letters to investors misrepresenting the state of operations in the Laguna Hills, California and Houston, Texas centers").

---

Rican sand for years on end. *See SEC v. Jakubowski*, 150 F.3d 675, 681-82 (7th Cir. 1998) ("Deliberate ignorance, the description of [defendant's] mental state most favorable to him, is a form of knowledge") (affirming summary judgment for SEC on fraud claims); *SEC v. Milan Group, Inc.*, 962 F. Supp. 2d 182, 201 (D.D.C. 2013) (granting summary judgment for SEC on fraud claims and rejecting scienter defense; "Even crediting her statements of ignorance, such statements only demonstrate extreme recklessness, not innocence.").

**B.**    **Defendants' Response: The SEC Has Failed To Prove That The Defendants Made and Disseminated Material Misstatements Regarding Company Assets Or Acted With Scienter.**

1.    The SEC has offered no evidence that Defendant Rice made a material misstatement regarding APB's assets to any investor or prospective investor.

It is unclear what the SEC is alleging that Mr. Rice did that would prove that, acting with scienter, he made a knowing misstatement of material fact or acted with reckless disregard for whether a statement was true or not or did so with regard to an omission of a material fact relating to an allegation of securities fraud. However, it appears that they allege the following to support an inference of scienter:

- that Rice was the Chief Financial Officer of APB.
- that Rice knew that APB had not acquired an interest in PR1 such that APB could assert ownership of assets in Puerto Rico.
- that PR1 had "cultivation under construction."
- that APB had a $500 million purchase order.
- that APB could claim revenue from Colorado because of its agreement with the Mindful Company.
- that APB had acquired the Sunfire Farm in Oregon.
- that APB had cannabis licenses in California.
- that APB's 2017 revenue statement was inaccurate.
- that APB was in dire financial condition

In some instances, the SEC specifically names Rice but in many others they simply rely on the use of the collective, "Defendants," for attributing this conduct to Rice. For many of these allegations, they SEC offers no evidence that Rice had any knowledge or involvement in the alleged action, and he did not. More importantly, the SEC offers no evidence that Rice had any participation in conveying this allegedly false information to any investor or prospective investor.

The only evidence the SEC appears to offer regarding Rice's involvement in disseminating material misstatements is the presence of his name on seven emails that have certain pitch decks attached to the email. For four of the emails, Rice's connection to the email is only that somebody copied him on an email. For the other two emails, Rice simply forwarded an email and attachment that someone sent to him.

Regarding the three emails Rice forwarded none were to investors. He sent the first on November 26, 2017, and it attached a document entitled American Patriot Brands Plan. [JAF_276] In neither instance was Rice forwarding this document to an investor. The first email he forwarded was to Brian Wilson at the request of Carl Peterson. Rice knew Wilson to be a lawyer who worked at a law firm with which Peterson was associated. Rice did not know why Peterson wanted him to send the plan to Wilson. Rice Declaration at ¶ 14. Moreover, it is clear this plan was a draft document that was subject to further edits. The second person he forwarded the plan to on November 30, 2017, was Shelly Meridian Ar, a business colleague of Rice. [JAF_247] Rice sent it to her to keep her apprised of projects on which he was working not to solicit an investment. Rice Declaration at ¶ 15. The third person he forwarded an email to was Zubin Mehta, who Rice knew was working in marketing with Carl Peterson. Rice did not send it to him to solicit an investment but because he was asked to forward it. Rice Declaration at ¶ 16.

For the other five emails, Rice was only the passive recipient of an email and attachment. JAF 249, 253, 248, 250, 251, Exhibits 8, 27,167,170, and 412. The SEC offers no argument or evidence as to why these emails support a finding of scienter by Rice.

Moreover, with respect to several of these allegations that supposedly support a finding of scienter, Rice had no knowledge about the alleged matter nor is it even referenced in the pitch decks the SEC refers to Rice being involved with. With respect to the "$500 million purchase" order, the only place a reference to this

43

appears is in a March 2019 email from Lee to Fred Kulikowski. Rice had no knowledge of this. Rice Declaration at ¶ 11.

With respect to the incomplete purchase of the Sunfire Farm in Oregon, the California licenses, Rice has no knowledge of these. Rice Declaration at ¶ 17. Rice was not aware of any alleged dire financial conditions of APB. Rice Declaration at ¶ 13.

The SEC also alleges that Rice's scienter is shown because he knew that APB had not acquired an interest in Puerto Rico One that APB did not have "cultivation under construction," and that APB had not acquired Mindful in Colorado. However, Rice never made any such claims to any investor or in any prospective investor communication. Rice Declaration at ¶ 12. Moreover, Rice knew that APB had a written agreement to own part of Puerto Rico One and had a substantial investment in Puerto Rico One. He also knew that APB had a purchase agreement to buy Mindful, although he later recommended to Lee for APB not to complete the purchase. Based on his business experience at IBM and other places, he knew that such actions and agreements supported a conclusion that a business owned an asset. Rice Declaration at ¶ 19. For all of these reasons, the Court should conclude that the SEC has not proved Rice acted with scienter regarding APB's supposed company assets and deny its summary judgment notion as to Rice. None of these benign emailings establish that Rice was soliciting investors much less that he did so with scienter. As the Supreme Court stated *Lorenzo v. Securities and Exchange Commission,* 587 U.S. 71 (2019) in analyzing Section 10b-5 liability, an individual is not liable "where an individual neither makes nor disseminates false information …." *Id.* at 82.

      2.    The SEC has not shown that Defendants Lee or Pallas made material misstatements regarding the Company's assets.

Both Lee and Pallas, like Rice, believed that because APB had written agreements to acquire a controlling interest in Puerto Rico and Mindful that APB

44

could claim ownership of those assets. APB had invested almost five million dollars in Puerto Rico. Lee was working with Puerto Rico counsel to find a legal procedure for APB to have a majority ownership in Puerto Rice One because the law did not allow an American company to own a Puerto Rico company. Lee was also working in coordination with his business partner, Ricky Castro, to establish cannabis businesses on the island. This included an interest in the Garrido Farm where cultivation was under construction to prepare for marijuana crops from hemp crops. During the first few years that APB worked with Castro and Puerto Rico One, the companies made substantial progress in identifying land for crops and dispensaries to sell their cannabis products. As a result, Lee and Pallas, in good faith believed the work in Puerto Rico permitted them to state that APB had substantial business dealings in Puerto Rico that they could convey to investors. Lee Declaration at ¶ 4.

With regard to the statements that APB has license agreements in California, Lee and Pallas believed this was true. At the time they had engaged the Element Seven Company to obtain such licenses. APB spent almost two million dollars to do this, and agents at Element Seven told Lee and Pallas that APB had received the licenses. In fact, Lee and Pallas later learned that Element Seven agents were committing fraud and had obtained the same licenses for another client. APB later sued Element Seven for this fraud. Lee Declaration at ¶ 5.

Regarding the Oregon Farm, again it is necessary to understand when Lee and Pallas made the statements about the Farm, and such statements should be considered in light of when the statements were made. The very purpose of the Initial Offering was to obtain the funds to more fully build out the business and obtain additional cannabis licenses. Lee Declaration at ¶ 6.

Finally, the SEC focuses on a single email that Lee wrote to Fred Kulikowski on March 9, 2019. [JAF_253] Kulikowski was one of the original Skipjack investors and, at that time, these investors were working with APB to expand the cannabis business. Lee wrote this to discuss expansion of the business, not to solicit or

maintain an investment. As the first sentence makes clear, Lee was only providing topics to discuss "to make our call more efficient …" regarding business plans. As such, it is not a communication regarding the offer or sale of securities or part of a scheme to defraud. Lee concluded the letter by stating he appreciated Kulikowski's "input and advice [sic] but would like to see you on the battlefield as well" to make the business successful. Lee Declaration at ¶ 7.

## III.    MISSTATEMENTS AND OMISSIONS CONCERING SECURITY/COLLATERAL

### A.    <u>SEC's Argument</u>

#### 1.    <u>Defendants Made and Disseminated Material Misstatements</u>

Defendants told investors the lie that the offered investments were backed by a security interest and collateral. For the Stonecrest Offering, Lee and APB told investors that they would obtain a first deed of trust on the Oregon Farm and a senior secured lien on the membership interests of Urban Pharms and DJ&S. [JAF_326-329] Investors obtained neither. [JAF_333-334]

Lee further pushed the lie that Urban Pharms had a value of as much as $400 million and the Oregon Farm a value of $200 million or more. [JAF_338-339, 341-342, 346] Lee and Pallas later told Clifford that the Oregon Farm had a value greater than $100 million [JAF_494]. Lee and Pallas had no factual basis for these fantastic valuations. The available facts suggested a value of that was a fraction of the disseminated valuations. [JAF_205-231]

For the $5 Million Raise, Lee, Pallas and APB told investors that their investments were "guaranteed" and that they would have the "SECURITY OF 1st Trust Deed," "like a mortgage on your home or your real estate." [JAF_395-396] They further promised that investor funds would be held in escrow until recording of the first trust deed. [JAF_358] But investors never received a first trust deed, the investment was not "guaranteed," and investor funds were released from escrow without the promised security. [JAF_376, 397-398] Investors apparently did not

receive even a note evidencing their loan. [JAF_360-361]

These statements regarding the supposed security and collateral backing the offered investments were material to investors as a matter of law. *See, e.g.*, *SEC v. Radical Bunny, LLC*, 532 Fed. Appx. 775, 777 (9th Cir. 2013) (affirming summary judgment for SEC on fraud claims where defendants falsely told investors that loans were secured by deeds of trust); *SEC v. Premier Holding Corp.*, No. 18-cv-813, 2020 WL 8099514, at *7 (C.D. Cal. Nov. 30, 2020) (granting summary judgment for SEC and holding that statement about the purported value of a significant asset was material to investors); *SEC v. TLC Investments and Trade Co.*, 179 F. Supp. 2d 1149, 1153 (C.D. Cal. 2001) (granting summary judgment to SEC on fraud claims and holding that false statement about investment being secured by an interest in real property was material); *see also SEC v. Loomis*, 969 F. Supp. 2d 1226, 1234 (E.D. Cal. 2013) (defendant's "statements that the loans were secured … were material"); *SEC v. Small Bus. Capital Corp.*, No. 12-cv-3237, 2013 WL 4455850, at *7 (N.D. Cal. Aug. 16, 2013) (statements that "all loans made by the Funds would be secured by deeds of trust" were "materially false and misleading" because the loans "were not secured by any real property").

## 2.    Lee and Pallas Acted with Scienter

Lee knowingly misrepresented the security interests and collateral backing the offered investments. With respect to misrepresentations made in the Stonecrest Offering, Lee signed the documents providing Knighted with the first deed of trust on the Oregon Farm and the senior lien against the membership interests of Urban Pharms and DJ&S. [JAF_332] Lee signed the documents on May 22, 2019, just weeks before the commencement of the Stonecrest Offering on July 26, 2019. [JAF_332] Lee knew and understood that Knighted had the senior liens, not the Stonecrest investors. [JAF_336]

With respect to the $5 Million Raise, Lee admitted in deposition that he knew Knighted still enjoyed the first deed of trust on the Oregon Farm, not investors.

47

[JAF_400] He claimed that Knighted had agreed to treat its interest in *pari passu* with investors. [JAF_400] But documents signed by Lee establish that Knighted always retained its superior interest. [JAF_402] Regardless, investors were promised the first trust deed, not an interest *pari passu* with a different lender. [JAF_394-396] Finally, Lee admitted that APB took investor funds from escrow without issuance of a first deed of trust for the benefit of investors. [JAF_376] Lee's knowing misrepresentations establish scienter. *See, e.g.*, *SEC v. Navellier & Assocs.*, 108 F.4th 19, 39 (1st Cir. 2024) (affirming summary judgment for SEC and explaining that the "publication of statements when that defendant knew facts suggesting the statements were inaccurate or misleadingly incomplete is classic evidence of scienter") (citation and internal quotation marks omitted).

Pallas acted at least recklessly and therefore with scienter. Pallas served as APB's COO, was the sole managing member of APB RE Holdings, which was to obtain the first trust deed for investors, signed the documents on behalf of APB RE Holdings, created the website APBrealestateholdings.com, arranged for the video touting the investment, arranged for the paid advertisement in which APB "guaranteed" the investment, and knew that Knighted had a first deed of trust. [JAF_357, 360, 366-370, 399] Pallas claimed in deposition that APB RE Holdings obtained a first deed of trust by "participat[ing] in the Knighted facility." [JAF_401] But, as Pallas must have known based on documents signed by him on behalf of APB RE Holdings [JAF_402], or recklessly disregarded, Knighted retained the superior interest. Regardless, investors were promised a first deed of trust, not unrecorded "participation" in the Knighted security interest. *Gebhart v. SEC*, 595 F.3d 1034, 1044 (9th Cir. 2010) (affirming SEC's scienter determination with respect to misstatement that notes were secured by recorded trust deeds where petitioner "conducted no meaningful independent investigation to confirm the truth of their representations"); *Radical Bunny*, 532 Fed. Appx. at 777 ("The undisputed facts … demonstrate that each Appellant either knew or was reckless in not

knowing, that these securities were not backed by the collateral they had promised their investors") (citation and internal quotation marks omitted); *TLC*, 179 F. Supp. 2d at 1155 (finding scienter where, *inter alia*, defendant "did not make any serious investigation on his own") *Loomis*, 969 F. Supp. 2d at 1235 (finding recklessness where "[t]he undisputed evidence establishe[d] that Loomis either knew that his statements [about loans being secured] were false at the time he made them, or that he at least did not take care to ensure that the loans were secured"); *Small Bus. Capital*, 2013 WL 4455850, at *7, 10 (where funds' disclosures stated that loans "would be secured" but defendant caused funds to make "unsecured loans," that showed defendant "acted intentionally or recklessly in carrying out the misrepresentations").

Finally, with respect to the valuations of the Oregon Farm and Urban Pharms, Lee and Pallas had no factual basis for disseminating their fanciful valuations ranging from $100 million, to $216 million, to $400 million. The information available to them indicated valuations that were a fraction of the represented amounts. Lee and Pallas had the BVA valuation in hand assigning a $3.53 million value to the Oregon Farm as of September 2016, as well as the January 2020 Warburton Appraisal valuing the Oregon Farm at $17 million. [JAF_211-213, 225-227] Lee created a document assigning a value of $11.7 million to the Oregon Farm and told Patin and Knighted that he was trying to sell Urban Pharms for $15-$25 million. [JAF_214, 223-224] And Lee signed a letter of intent on behalf of APB to sell all of Urban Pharms, DJ&S, TSL and the Oregon Farm for total consideration of $12.5 million. [JAF_231]

These undisputed facts establish scienter. The valuations did not "fairly align" with the information available to Lee and Pallas at the time. *GenAudio*, 32 F.4th at 935; *id*. at 924 ("[N]o matter how Panglossian their view of the world, corporate executives … cannot make material representations to their shareholders in blatant disregard of obvious facts"); *Premier Holding*, 2020 WL 8099514, at *8 (finding

scienter with respect to valuation misstatements where defendants were aware of
contrary information).

## B.    <u>Defendants' Response</u>

### 1.    Defendants Lee and Pallas Did Not Make and Disseminate Material Misstatements Concerning Security/Collateral.[12]

At the time of the Stonecrest Offering, Lee believed that the investors would
receive a first deed of trust regarding the Oregon Farm and a senior secured lien on
the membership interests of Urban Pharms and DJ&S. For this he relied on the
statements in the Stonecrest PPM that was prepared by the offeror. This document
disclosed that APB may use a significant portion of the proceeds to repay other
loans secured by the Oregon Farm. Lee Declaration at ¶ 8.

Lee also based his statement that Urban Pharms had a large potential value
based on investments major companies were making in similar cannabis farms. He
based his claim that the Oregon Farm had a value of $200 million or more on the
report that Jon Zimmerman prepared for APB. This reflected the potential value of
the Farm if fully built-put, which was what Lee was working on in 2017. Also, Lee
did not tell Clark Clifford that the Oregon Farm had value of more than $100
million. Clifford told that to Lee after Clifford first visited the Farm. Lee Declaration
at ¶ 9.

Regarding the $5 million raise Lee based his statement that the investors
would receive a first deed of trust on his understanding that Knighted had agreed to
permit the investors to share Knighted's interest in the Farm. [JAF_399] Based on
this, he also believed that the investor funds could be released from escrow.
Similarly, Pallas believed the investors had obtained a first deed of trust because
ABP RE Holdings had that position through its financial participation in Knighted
facility and security interest. [JAF_400]

---

[12] The SEC makes no allegations against Defendant Rice in this argument regarding
security/collateral.

50

Finally, Lee and Pallas based their estimate of the valuation for the Oregon Farm and Urban Pharms based on the explosive growth the cannabis industry had in during this period beginning in 2017. The SEC mistakenly sees valuation only as valuation of the land property not the potential value. Lee and Pallas knew, for example that, Constellation Brands had invested $4 billion into the Canopy cannabis company business, that Molson Coors had invested $1 billion in the HEXO cannabis business and Altira Tobacco had invested $2 billion into the Cronos cannabis company. Lee Declaration at ¶ 10

## IV. MISSTATEMENTS AND OMISSIONS CONCERNING APB'S AND URBAN PHARMS' FINANCIAL AND BUSINESS PERFORMANCE

### A. SEC's Argument

#### 1. Defendants Made and Disseminated Material Misstatements

Lee, Pallas, and Rice lied about the financial performance of APB and Urban Pharms while omitting to disclose material facts about APB's, Urban Pharms', and TSL's dire financial state. For example, in connection with the Garden Unit Offering, Lee directed the preparation of false financial statements showing that Urban Pharms in 2022 had revenue of $10.1 million and income from operations of $6.3 million. [JAF_476] In fact, for 2022 Urban Pharms generated total revenue of just $942,723, with an EBITDA loss of ($2.5 million). [JAF_82] In connection with the $5 Million Raise, Lee and Pallas told investors that APB had a "profitable income statement." [JAF_404] But APB has never turned a profit and had lost more than ($50 million) in the four years preceding that offering. [JAF_80] In connection with the Stonecrest Offering, Lee told investors that APB was profitable, achieving $6.5 million EBITDA in 2019. [JAF_347] But again, neither APB nor its subsidiaries were profitable. APB lost ($6.8 million) in 2019, Urban Pharms lost ($29,380) and TSL lost ($1.2 million). [JAF_79, 82, 83] Finally, with respect to the Initial Offering, Lee and Rice told investors that APB had achieved $8.1 million, $8.2 million or $10 million in revenue for 2017 when, in fact, the company had

revenue of $4.4 million. [JAF_79] Defendants also omitted telling investors about APB's dire financial situation, including that Urban Pharms and TSL owed hundreds of thousands of dollars in payroll and trust taxes, that employees of Urban Pharms routinely had to pay operating expenses on their personal credit cards because APB could not (or would not) do so, and that APB had defaulted on its debt. [JAF_98-132]

Separately, in connection with the Garden Unit Offering, Lee and Pallas reviewed and approved marketing materials stating that Urban Pharms had produced more than 24,000 lbs. of outdoor marijuana flower in 2021 when, in fact, the 2021 harvest had yielded less than 4,200 lbs. [JAF_454] They also reviewed and approved the false statement that Urban Pharms had produced nearly 100,000 lbs. of marijuana flower since its inception when, in fact, Urban Pharms had produced less than 23,000 lbs. [JAF_457]

These statements were material to investors as a matter of law: They grossly overstated APB's and Urban Pharms' financial and business performance. *SEC v. Global Express Capital Real Estate Inv. Fund, I, LLC*, 289 Fed. Appx. 183, 187 (9th Cir. 2008) (affirming summary judgment for SEC on fraud claims and explaining that "[t]he misstatements and omissions created the false impression that [the company] was profitable, an impression that would have assumed significance in the deliberations of any reasonable investor"); *SEC v. Murphy*, 626 F.2d 633, 653 (9th Cir. 1980) ("Surely the materiality of information relating to financial condition, solvency and profitability is not subject to serious challenge.").

### 2. Lee, Pallas, and Rice Acted with Scienter

Lee knew that the statements about Urban Pharms' 2022 revenue and income were false. Lee directed Patin to create the false and misleading financial statements by booking investor funds received by DJ&S as "revenue" and "operating income"

for Urban Pharms.[13] [JAF_475]

Lee and Pallas certainly knew that APB did not have a "profitable income statement" in 2021 when the $5 Million Raise commenced. APB never has had a "profitable income statement," and its financial condition was particularly bad by the time of the $5 Million Raise. [JAF_79] On June 1, 2021—right at the commencement of the offering—Pallas prepared a letter detailing APB's "current financial challenges," apparently to seek forbearance. [JAF_107] The letter identifies, among other things, past due payroll taxes of more than $800,000. [JAF_107] Lee also knew that the company was not profitable. Things were so bad for the company that Lee's own mother had to extend a $40,000 loan for Urban Pharms to make payroll in November 2021, and the company was unable to pay Pallas and Patin, APB's COO and Controller. [JAF_127-129]

Lee and Rice also knew that statements to investors about 2017 revenues were misleading at a minimum because they included biological assets and unsold inventory. [JAF_261-262, 265, 268] Lee had Patin add in these non-GAAP "revenues" to hit targets. [JAF_268] *SEC v. Revolutionary Concepts, Inc*., No. 21-10984, 2022 WL 386085, at *9 (11th Cir. Feb. 9, 2022) (affirming summary judgment for SEC explaining that record supported scienter where blatantly false EBITDA number was presented and defendant did nothing to apprise himself of true state of affairs).

Finally, Lee and Pallas knew that Urban Pharms had not cultivated more than 24,000 lbs. of outdoor marijuana flower in 2021 and close to 100,000 lbs. from 2016-2021. For its entire history, Urban Pharms has never had an annual yield of more than 5,181 lbs. of outdoor flower. [JAF_454] Pallas' job as COO was to

---

[13] In his deposition, Lee tried to suggest that a mistake had been made, contrary to the testimony of Patin. This was no "mistake." Lee and Patin disseminated similarly false financials to Clifford just a few months earlier showing that Urban Pharms had generated revenue of $8.1 million and income from operations of $5.9 million through September 30, 2022. [JAF_482]

oversee Urban Pharms' operations, and Lee and Pallas had access to historic harvest yields and harvest projections. [JAF_463] They used this information to generate forecasts and   business plans. [JAF_461] Lee even had a heated meeting with an Urban Pharms employee in January 2022 about the 2021 anticipated crop yield and became frustrated and angry after being corrected and told that the total yield would be less than 5,000 lbs. of flower. [JAF_467-472]

### B.  **Defendants' Response: The SEC Has Failed To Prove The Defendants Made Misstatements And Omissions Regarding APB's And Urban Pharm's Financial And Business Performance**

1.  The SEC Has Failed To Prove That Defendant Rice Lied About APB's Financial Performance in 2018.

The SEC alleges that "Rice lied about the financial performance of ABP and Urban Pharms…." SEC Brief at 43. They also ambiguously state that "the Defendants" omitted telling investors about APB's dire financial condition…. *Id.* at 44. However, the SEC has failed to prove Rice made such a false statement in connection with the purchase of APB securities.

The SEC apparently against bases its argument that Defendant Rice committed scienter based on the instances where somebody else copied Mr. Rice on an email sending a "pitchdeck" to some individual and or where he forwarded a pitch book that someone else had forwarded to him. For the reasons stated in the Defendants' Response in Section II B.1. regarding company assets, supra at pp. 41-44, the Court should reject the SEC claim regarding Mr. Rice.

Moreover, the only instance where the SEC alleges Rice made a misstatement regarding APB's financial performance in 2017. The SEC alleges Rice knew that APB had misstated its revenues in 2017 because Lee directed Lee Patin, APB accountant to include "biological assets" in the report as revenue. As a result, the SEC alleges, APB's 2017 revenues were $4.2 million not $8.1 million. Again, the SEC has offered no evidence that Rice disseminated this information to be used to obtain any investment. Moreover, Rice knew that in the cannabis industry, many companies

recognized biological assets as revenue and Rice understood this was the basis for the $8.1 million revenue statement. Rice, thus, had no reason to challenge Lee's accounting decision. He did, though, recommend for strategic to recommend that APB not include biological assets in revenue for its 2019 revenue projections. Rice Declaration at ¶ 18.

> 2. The SEC has failed to prove that Defendants Lee and Pallas acted with scienter regarding financial performance.

Similarly, Lee based his 2017 revenue statement on the use of biological assets as revenue, which he understood to be the industry standard for revenue reports. Lee Declaration at ¶ 11. This negates any inference of scienter by Lee regarding the revenue statement.

The SEC also alleges that Lee and Rice knew that APB did not have profitable income statements at the time of the $5 Million Dollar Raise, although a pitch deck said in one corner of a document "Profitable Income Statements Available For Review Upon Request." However, neither Lee nor Pallas know why this statement is on the document or who wrote it. The agree that this was an error, and they had no intention to include such a statement in any pitch document. Pallas Declaration at ¶ 3.

The SEC also alleges that Lee directed Patin to prepare false financial statements for 2022 and claim that Urban Pharms had revenue of $10.1 million. This statement was mistakenly conveyed, and Patin initially attributed the revenue to Urban Pharms in a draft report prepared by Lee Patin. In fact, the report should have referenced APB operations, which accurately stated its revenue. In the final report to Oregon state, APB listed its revenue at $10.1 million. Lee Declaration at ¶ 12.

The SEC alleges that Lee told investors in connection with the Stonecrest Offering that APB was profitable, achieving $6.5 million in EBITDA. Lee based his statement that APB had achieved this EBITDA based on the figure that were contained in the Stonecrest Offering Memorandum. Lee Declaration at ¶ 13.

The SEC further argues that Lee and Pallas approved marketing materials for the Garden Unit Offering that showed Urban Pharms had produced more than 24,000 lbs of marijuana flower and nearly 100,000 lbs since its inception. Here, again, the issue relates to biological assets, which APB included in its definition of marijuana flowers. The APB records shows that it cultivated more than 24,000 lbs of marijuana harvest before the Garden Unit Offerings and approximately 97,000 lbs since inception. Pallas Declaration at ¶ 4. [JAF_459]

## V.    MISSTATEMENTS AND OMISSIONS CONCERNING GENERAL CLARK'S INVOLVMENT WITH APB

### A.    SEC'S Argument

Defendants fraudulently misled investors when they repeatedly (and falsely) touted General Clark's involvement with the company, including his supposed "leadership" position at APB. [JAF_274-279] Lee and Rice acted with scienter in making and disseminating this lie. Both have admitted that the statements were false and that they knew that General Clark did not want to be affiliated with APB after APB became a marijuana company in 2016. Indeed, Lee testified that he asked General Clark to resign from APB's board of directors after the company shifted its focus from grilled cheese trucks to marijuana because General Clark is "a significant figure, and cannabis is so controversial." [JAF_284] For his part, Rice admitted to receiving a December 2017 email from General Clark stating in no uncertain terms that General Clark was "not on the board, nor… [an] advisor" to APB. [JAF_285] Rice further admitted that General Clark then called Rice to reinforce the point, stressing that he did not want "to be painted with the cannabis brush." [JAF_286] Yet Lee and Rice persisted in disseminating investor materials describing General Clark as part of "APB Leadership" and "Executive Team." These admissions establish knowing misrepresentations and therefore scienter.

The statements also were material. Investors consider company leadership in deciding to make an investment. *See SEC v. Blackburn*, 15 F.4th 676, 681 (5th Cir.

2021) ("Investors make decisions about whether to invest their money in a company, in part, based on the company's leadership.") (affirming summary judgment for SEC on fraud claims); *SEC v. Wayland*, No. 17-cv-1156, 2019 WL 2620669, at *6 (C.D. Cal. Apr. 8, 2019) (statements about management experience were material; granting summary judgment to SEC on fraud claims). The purported involvement of General Clark in APB's "leadership" was particularly material to investors. APB lacked audited financial statements, had no history of profitability, and had entered a brand new and (per Lee) "controversial" industry, with marijuana remaining federally illegal. General Clark—a retired four-star general, former Supreme Allied Commander of NATO, and a one-time serious candidate for President of the United States—added needed (albeit false) credibility to Defendants' sales pitch to investors. [JAF_199]

### B.    **Defendants' Response**

1.    Neither Lee Nor Rice Misled Investors Concerning General Clark's Involvement With APB.[14]

The SEC argues that Lee and Rice misled investors when they described General Clark as part of APB's leadership. However, the evidence will show that both had a good faith basis for their understanding and description as a "Humanitarian and Global Advisor" of Clark's relationship with respect to APB.

First, with respect to Rice, here again the SEC has provided no evidence that Rice made any statement regarding General Clark to any investor or potential investor. Accordingly, he could not have made any misstatement about Clark's role as part of a securities fraud scheme. Moreover, a material fact of dispute exists as to whether Rice and Lee acted with scienter regarding Clark's involvement. For Rice's part, the only individuals he knew who had invested in APB were the Skipjack investors. Because Clark and Rice were and are friends and business associates, when Clark emailed and called Rice in December 2017 to tell him he did not want to

---

[14] The SEC makes no allegation against Defendant Pallas regarding this.

be associated with a cannabis company, Rice arranged for Clark to meet with the Skipjack investors to explain his role regarding APB. During the meeting, Clark told the investor that he could not raise money for a cannabis company or be involved in their business activities, but would assist Lee and APB where he could. Rice knew that Clark helped Lee get aid to Puerto Rico after Hurricane Maria. Rice also knew Clark advised Lee to avoid doing business in Columbia because it was dangerous. After Clark called Rice, Rice also spoke to Lee and told him to resolve this issue with Clark. Lee subsequently told Rice that Clark did not object to being referred to as a humanitarian advisor. Rice also asked Clark if he had resolved the matter with Lee. Clark said he had, and Clark never spoke to Rice about this issue again. Rice Declaration at ¶ 8.

Lee also believed that he had Clark's consent to refer to him as a humanitarian and global advisor. Clark had provided substantial assistance to Lee in getting aid to Puerto Rico after the hurricane. Lee sought Clark's assistance both for humanitarian reasons and to aid to his efforts to establish a cannabis business in Puerto Rico. Also, Lee had extensive discussions with Clark about the political situations in Latin America when Lee was considering investing there. Lee particularly remembers Clark forcefully warning him to avoid Columbia because it was too dangerous. Lee Declaration at ¶ 14. Accordingly, because the issue regarding General Clark is in dispute between the parties and the Defendants have provided countervailing evidence, the Court should deny the SEC's motion for summary judgment on this ground.

## VI. MISSTATEMENTS AND OMISSIONS CONCERNING THE USE OF INVESTOR FUNDS

### A. SEC's Argument

Statements about the use of investor funds are material to investors. *See, e.g.,* *SEC v. Research Automation Corp.*, 585 F.2d 31, 35-36 (2d Cir. 1978) ("It is beyond cavil that [defendant's] misleading statements and omissions [about the use of

investors' funds] concerned facts that were material as a matter of law."); *Advance Body Imaging*, 2009 WL 10673586, at *3 ("Misrepresentations as to the use of investor funds are clearly material.") (citing *SEC v. First Pacific Bancorp*, 142 F.3d 1186, 1189 (9th Cir. 1998)). Lee, Pallas, and the Corporate Defendants here authorized and made two different sets of misrepresentations concerning the use of investor funds.

First, in connection with the Garden Unit Offering, Lee, Pallas, APB, DJ&S, and Urban Pharms approved and caused to be disseminated to investors the false statement that investor funds had been used and only would be used "for expansion purposes." [JAF_490] In fact, Defendants used only a fraction of investor money "for expansion purposes," and Lee and Pallas, as APB's CEO and COO (and APB's only corporate officers at the time), knew that Defendants would not be using investor funds "for expansion purposes only." Prior to the dissemination of this lie, Lee told an investor that the company mostly would realize profit from the sale of Garden Units, and only a small portion of investor proceeds would be needed for expansion (per Lee, for every $7.5 million raised, $1.5 million would be for expansion and $5.5 million for profit/operating expenses). [JAF_492] In the final analysis, Defendants spent just a few hundred thousand dollars of the raised $9.375 million on expanding operations to Garden 2. [JAF_491] These undisputed facts establish Lee's and Pallas' scienter as a matter of law. *See, e.g.*, *Navellier*, 108 F.4th at 39 (1st Cir. 2024) (explaining that the "publication of statements when that defendant knew facts suggesting the statements were inaccurate or misleadingly incomplete is classic evidence of scienter" and affirming summary judgment for SEC) (citation and internal quotation marks omitted).

Second, in connection with the Initial Offering, Lee and APB failed to disclose that investor money enabled Lee's lavish lifestyle in Puerto Rico—including hundreds of thousands of dollars for Lee to live at the luxury Vanderbilt Hotel and in luxury beachfront condominiums, $3400/month for Lee to have a

personal cook and cleaner, tens of thousands of dollars for spas and wellness treatments, thousands of dollars to pay for expenses at Jimmy Choo, Toys R Us, Macy's and other vendors lacking any connection to cannabis, and thousands of dollars to pay the travel expenses of Lee's girlfriend and her family members. [JAF_61-74] Lee controlled APB's finances and directed the payments on his behalf. [JAF_93-96] These undisputed facts present the classic scienter fact pattern and establish Lee's scienter. *See SEC v. Watkins Pencor, LLC*, 810 Fed. Appx. 823, 829 (11th Cir. 2020) (affirming summary judgment for SEC where defendants misrepresented the use of investor funds and used funds to pay personal expenses); *SEC v. Skinner*, No. 21-cv-5273, 2022 WL 2784811, at *5 (C.D. Cal. June 17, 2022) (concluding that defendant "acted at least recklessly" in failing to disclose that investor funds were used to pay personal expenses and granting summary judgment for SEC); *SEC v. Chen*, No. 15-cv-7425, 2016 WL 7469683, at *9 (C.D. Cal. Dec. 8, 2016) (holding that misuse of investor funds for lavish lifestyle was "sufficient to find [defendant] acted with scienter" and granting summary judgment for SEC); *SEC v. Smith*, No. 04-cv-739, 2005 WL 2373849, at *8 (S.D. Ohio, Sept. 17, 2005) ("Smith's admission that he spent investor funds on personal expenses establishes the requisite state of mind for committing securities fraud-recklessness") (citation and internal quotation marks omitted), *aff'd by* 208 Fed. Appx. 402 (6th Cir. 2006); *SEC v. Karroum*, No. 17-cv-0187, 2018 WL 11230398, at *4 (E.D. Va. Feb. 2, 2018) ("[A] reasonable investor would not provide funds to support Defendants' lifestyle absent circumstances that indicate charity.").

## B. <u>Defendants' Response</u>[15]

The SEC alleges that Lee and Pallas made misrepresentations regarding the use of investor funds. First, the SEC asserts with regard to the Garden Unit Offering, Lee and Pallas disseminated false statements that the money would be used for

---

[15] The Sec makes no allegation against Rice regarding this.

expansion purposed. However, APB did use this money for expansion purposes. In addition, to building the Second Garden Unit, APB made substantial improvements on the Farm including irrigation facilities, lighting, and other improvements to the land. Lee Declaration at ¶ 15.

The SEC also asserts that with respect to the Initial Offering, Lee and APB failed to disclose that investor money was used to fund "Lee's lavish lifestyle in Puerto Rico." However, APB did not use this money improperly with respect to Lee's work to establish a cannabis business in Puerto Rico. APB did not pay for a "lavish lifestyle" for Lee but rather for necessary living and business operating expenses to allow Lee to work on building the business while living away from his home in California. Among these expenses in Puerto Rico were substantial investments in Puerto Rico One, including purchase of real property, expenses for legal work, expenses related to the cannabis dispensaries, and expenses relating to airplane flights, diesel generators needed for power after Hurricane Maria, and other business expenses. Lee provided expense records for these expenses to APB for which he was reimbursed. Lee Declaration at ¶ 16.

## VII.   OTHER FACTS CONCERNING SCIENTER

### A.    SEC's Argument: The Entire Record Establishes Scienter

The entire record establishes that Lee, Pallas, and Rice acted at least recklessly and therefore with scienter. The misstatements and omissions in this case do not present close calls. They concern blatant lie after blatant lie about non-existent company assets, fake security and fake collateral, false financial statements, the fake involvement of a retired Four-Star General, and investor funds enabling Lee's luxury lifestyle and to cover the expenses of Lee's girlfriend. In *SEC v. Lyttle*, the Seventh Circuit affirmed summary judgment for the SEC on its fraud claims where, like in this case, defendants pushed numerous lies. In rejecting defendants' scienter arguments and supposed good faith, Judge Posner posited that it was "inconceivable that the defendants could have believed the cascade of fantastic lies

that they told the investors." 538 F.3d at 604. So too here. *See also SEC v. Presto Telecommunications, Inc.*, 237 Fed. Appx. 198, 200 (9th Cir. 2007) (affirming summary judgment for SEC and finding scienter established given "the pervasiveness of [defendant's] misrepresentations, the obvious falsity of the information he provided to investors, and the flagrant personal use of investor funds").

Additional undisputed facts underscore scienter in this case. Those facts include: (1) Lee's refusal to surrender control of APB's finances to Michael Smith after Smith became APB's CEO [JAF_41-43], (2) Lee's firing of Smith after Smith had demanded the implementation of internal controls and transparency regarding expenditures in Puerto Rico [JAF_45], (3) above-market compensation received by Lee, Pallas, and Rice despite the relatively small-scale Oregon operation and tens of millions in losses [JAF_53], (4) the apparent failure of APB to report to the IRS the $1.97 million in compensation paid to Lee [JAF_55], (5) the failure of Lee, in turn, to report his APB-related compensation to the IRS [JAF_56-57], (6) unpaid trust, payroll and other taxes [JAF_98-114], and (7) virtually nothing to show for the $50 million in raised investor money [JAF_33-35].

The Court should consider the entire record in granting summary judgment in favor of the SEC.

**B.    Defendants' Response**

The SEC list several different factors that they allege "underscore scienter in this case," but provides no explanation as to why these facts show scienter. Facts one and two relate to issues Lee had with Michael Smith, who he had hired to be APB's CEO. However, Lee quickly found that Smith could not perform his duties and fired him. This was a business decision Lee had the authority to make. The SEC next argues that Lee, Pallas, and Rice received above market compensation reliable to their positions. Here, again with respect to Rice, the SEC attempts to view Rice as the CFO, which he was not. Moreover, payments to Rice beginning in 2017 and

ending in July 2019 were contractually negotiated and were appropriate for a business consultant of Rice's experience. With respect to Lee and Pallas, they received only a fraction of their expected pay. From 2016-2024, Lee was paid a total of $1,493,632, and he loaned back to APB $750,000, resulting in a net average salary of $106,356. Pallas was paid $851,410 but made loans to APB of $1,161,828, leaving him with debt of $301,762. Pallas Declaration at ¶ 5. These are not above average market salaries.

The SEC also lists four other facts that it claims prove scienter: "The apparent failure" of APB to report $1.97 compensation to Lee, the failure of Lee to report this supposed compensation, unpaid payroll taxes, and "virtually nothing to show" for the money raised. However, the SEC offers no explanation or basis as to why these alleged facts shown scienter, and the Court should not consider them, and deny the SEC's motion.

DATED:  April 9, 2025

By: */s/ Eugene N. Hansen*
EUGENE N. HANSEN

Admitted Pro Hac Vice
SECURITIES AND EXCHANGE
COMMISSION
100 F Street, N.E.
Washington, D.C. 20549
202-551-6091
hansene@sec.gov

Counsel for Plaintiff

63

DATED:  April 9, 2025

By: */s/ Russell D. Duncan*
RUSSELL D. DUNCAN

Admitted Pro Hac Vice
CLARK HILL PLC
555 South Flower Street
Suite 2400
Los Angeles, CA 90071
213-891-9100
rduncan@clarkhill.com

Counsel for Defendants

1

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned, counsel of record for Plaintiff Securities and Exchange Commission, certifies that this brief is 63 pages, which complies with the page limitation set by the Court's order dated February 12, 2025 [Dkt. No. 108].


DATED:  April 9, 2025

By:  */s/ Eugene N. Hansen*
     EUGENE N. HANSEN

Admitted Pro Hac Vice
SECURITIES AND EXCHANGE
COMMISSION
100 F Street, N.E.
Washington, D.C. 20549
202-551-6091
hansene@sec.gov

Counsel for Plaintiff