UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES – GENERAL

| | | | |
|---|---|---|---|
| Case No. | 2:23-cv-05379-AH-(BFMx) | Date | June 16, 2025 |
| Title | Securities and Exchange Commission v. American Patriot Brands, Inc. et al. | | |

Present: The Honorable  Anne Hwang, United States District Judge

| Yolanda Skipper | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

Attorney(s) Present for Plaintiff(s):     Attorney(s) Present for Defendant(s):

None Present                              None Present

**Proceedings:   (IN CHAMBERS) ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT (DKT. NO. 115)**

Before the Court is Plaintiff Securities and Exchange Commission's ("Plaintiff") Motion for Partial Summary Judgment against Defendants American Patriot Brands, Inc. ("APB"), Urban Pharms, LLC ("Urban Pharms"), DJ&S Property #1, LLC ("DJS"), TSL Distribution, LLC ("TSL"), Robert Y. Lee, Brian L. Pallas, and J. Bernard Rice (collectively, "Defendants"). Dkt. No. 115.

On April 9, 2025, the Parties filed their Joint Brief ("J. Br.") (Dkt. No. 115-1), along with the Joint Appendix of Facts ("JAF") (Dkt. No. 115-2) and five volumes of the Joint Appendix of Evidence ("JAE") (Dkt. Nos. 115-3–115-7). On April 25, 2025, Plaintiff filed its Reply brief. Reply, Dkt. No. 119. The matter is fully briefed and the Court heard oral argument on June 11, 2025. For the reasons below, the Court GRANTS Plaintiff's Motion for Partial Summary Judgment.

I.     BACKGROUND

The following summarized facts are relevant to the instant Motion. *See generally* JAF, Dkt. No. 49-2.[1]

APB is a Nevada corporation that previously was known as "The Grilled Cheese Truck, Inc." and operated a food truck business. JAF 1-2. In 2016, APB decided to enter the marijuana business. JAF 3. In September 2016, APB acquired Urban Pharms and DJ&S. JAF 5. DJ&S owns a 275-acre farm located near Medford, Oregon (the "Oregon Farm"), at which Urban Pharms conducts marijuana-related operations. JAF 6-8. In 2017, APB acquired TSL, which distributed marijuana to Oregon dispensaries pursuant to an Oregon cannabis distribution license. JAF 9-11.

Robert Lee has served as APB's CEO and Chairman of the Board of Directors since 2016, excluding a brief period in 2019, and has maintained ultimate responsibility for APB, including approving investor slide decks, raising money from investors, and controlling the finances of APB, Urban Pharms, DJ&S, and TSL (collectively, "Corporate Defendants"). JAF 15, 93-96, 242, 268, 273. Brian Pallas has served as APB's Chief Operating Officer ("COO") since at least 2017 and has been a member of APB's Board of Directors since at least 2018. JAF 16. Pallas is the managing member of Urban Pharms, DJ&S, and TSL. JAF 21. APB's only two corporate officers since 2021 have been Lee and Pallas. JAF 17. Pallas and Lee jointly manage, exercise control over, and execute contracts on behalf of APB's subsidiaries including Urban Pharms, DJ&S, and TSL. JAF 15, 20-21, 93, 357, 402, 410, 412, 414.

J. Bernard Rice began consulting for APB around March 2017, obtained the title of Executive Vice President of Corporate Development, and was added the title of Chief Financial Officer in October 2017.[2] JAF 22. Rice left APB around July 2019 and never assumed traditional CFO responsibilities. JAF 23-24.

---

[1] The facts set forth below are taken from the Parties' JAF and the submitted evidence. *See generally* JAF. To the extent that any of the relevant facts were allegedly disputed by the opposing party, the Court discusses those facts below or concludes that no actual dispute exists or that the adopted language resolves the dispute.

[2] Defendants dispute this fact and clarify that "Rice never served as CFO and had no financial authority or responsibilities. The title was only on paper." *See* JAF 22.

From 2016 until this case was filed in 2016, Defendants raised over $50 million from investors. JAF 4. They did so through the four securities offerings that are at issue in this case:

(1) "The Initial Offering": from 2017 to early 2019, Lee, Rice, and APB solicited debt and stock investments from several individuals and investor groups. JAF 238-247.

(2) "The Stonecrest Offering": from July 26, 2019 through November 15, 2019, APB engaged Stonecrest Capital Markets, Inc. ("Stonecrest"), a securities broker-dealer, to sell secured convertible notes to residents of Puerto Rico purporting to be secured by a first priority pledge of the membership interests of Urban Pharms and DJ&S. JAF 289-314.

(3) "The $5 Million Raise": from approximately July 2021 through April 2022, Lee, Pallas and APB attempted to raise money through an offering of a secured convertible debt involving membership interests in an entity created by Lee, Pallas, and APB known as "APB Real Estate Holdings, Inc." JAF 353-377.

(4) "The Garden Unit Offering": from May 2022 through March 2023, Lee, Pallas, APB and DJ&S sold membership units in two entities, Value Properties I, LLC and Value Properties II, LLC, that leased the Oregon Farm's gardens. JAF 408-438.

Plaintiff brought a Complaint against Defendants on March 16, 2023 alleging violations of the following securities laws: Section 17(a) of the Securities Act ("Section 17(a)"), 15 U.S.C. § 77q(a); Section 10(b) of the Exchange Act ("Section 10(b)"), 15 U.S.C. § 78q(b), and Rule 10b-5 ("Rule 10b-5"), 17 C.F.R. § 240.10b-5. Compl., Dkt. No. 1. Plaintiff now seeks partial summary judgment as to liability but not remedies. J. Br. at 1, n.1. Plaintiff does not seek summary judgment as to Count III, its unjust enrichment claim against the Relief Defendants, nor all of Defendants' fraudulent misstatements, omissions, and deceptive conduct, which it reserves its rights with respect thereto. *Id.*

---

The Court does not find a genuine dispute here, but notes that pitch decks circulated to potential investors listed Rice as CFO. *See e.g.* JAE 0685A; JAE 0705.

## II.  LEGAL STANDARD

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue of fact is "genuine" only if there is sufficient evidence for a reasonable fact finder to find for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it may affect the outcome of the case, and the "substantive law [] identif[ies] which facts are material."  *Id.*  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Id.*

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, discovery responses, and "affidavits, if any," that demonstrate the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).  To carry its burden of production, the moving party must either: (1) produce evidence negating an essential element of the nonmoving party's claim or defense; or (2) show that there is an absence of evidence to support the nonmoving party's case.  *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  If the moving party meets its initial burden, the nonmoving party must set forth, by affidavit or as otherwise provided in Rule 56, "specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 248 (cleaned up).  The evidence presented by the parties must be capable of being presented at trial in a form that would be admissible in evidence.  *See* Fed. R. Civ. P. 56(c)(2).  "In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence."  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).  The court must draw all reasonable inferences in the nonmoving party's favor.  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Anderson*, 477 U.S. at 255).

## III.  DISCUSSION

### A. Anti-Fraud Provisions

"Section 17(a) of the 1933 Act, Section 10(b) of the 1934 Act, and Rule 10b-5 'forbid making [1] a material misstatement or omission [2] in connection with the offer or sale of a security [3] by means of interstate commerce.'"[3] *SEC v. Phan*, 500 F.3d 895, 907-08 (9th Cir. 2007) (quoting *SEC v. Dain Rauscher*, 254 F.3d 852, 856 (9th Cir. 2001)). These antifraud provisions prohibit both "schemes to defraud[] and . . . 'making a material misstatement or omission in connection with the offer or sale of a security by means of interstate commerce.'" *SEC v. Stein*, 906 F.3d 823, 830 (9th Cir. 2018) (quoting *Dain Rauscher*, 254 F.3d at 855-56). "[V]iolations of Section 17(a)(1), Section 10(b) and Rule 10-b5 require a showing of scienter, while violations of Sections 17(a)(2) and (3) require a showing of negligence." *Id.* (citing *Dain Rauscher*, 254 F.3d at 856).

### 1.  Material Misstatement or Omission

"The standard of materiality is an objective one." *United States v. Jenkins*, 633 F.3d 788, 802 (9th Cir. 2011) (citing *United States v. Reyes*, 577 F.3d 1069, 1076 (9th Cir. 2009)). This standard will be "satisfied only if there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" *Phan*, 500 F.3d at 908 (quoting *Basic v. Levinson*, 485 U.S. 224, 231-32 (1988)). Although "[d]etermining materiality in securities fraud cases 'should ordinarily be left to the trier of fact,'" materiality may appropriately be resolved as a matter of law at summary judgment where "the established omissions are 'so obviously important to an investor, that reasonable minds cannot differ on the question of materiality.'" *Id.* (citations omitted).

### 2.  Scienter

"Violations of Section 17(a)(1), Section 10(b) and Rule 10b-5 require scienter…. Violations of Sections 17(a)(2) and (3) require a showing of negligence." *Phan*, 500 F.3d at 908 (quoting *Dain Rauscher*, 254 F.3d at 856).

---

[3] The parties do not dispute that the alleged misstatements and omissions were made in connection with the offer or sale of a security or by means of interstate commerce. As such, the Court need not analyze these factors.

"[S]cienter refers to 'a mental state embracing intent to deceive, manipulate, or defraud.'" *Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 648 (2010) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n.12 (1976)). Analyzing scienter "is a subjective inquiry," which "turns on the defendant's actual state of mind." *Gebhart*, 595 F.3d at 1042. As a result, "[p]roof of scienter is often based on inferences from circumstantial evidence." *SEC v. Burns*, 816 F.2d 471, 474 (9th Cir. 1987). "Scienter can be established by intent, knowledge, or in some cases 'recklessness.'" *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1092 (9th Cir. 2010) (citing *Hollinger v. Titan Cap. Corp.*, 914 F.2d 1564, 1568-69 (9th Cir. 1990) (en banc)). The "deliberate recklessness" standard entails "'an *extreme* departure from the standards of ordinary care,' which 'presents a danger of misleading buyers or sellers that is either known to the defendant or is so *obvious* that the actor must have been aware of it.'" *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 701 (9th Cir. 2021) (quoting *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 414 (9th Cir. 2020)). "[A] reckless omission of material facts satisfies the element of scienter, provided that such recklessness reflects some degree of intentional or conscious misconduct." *Id.* (internal quotation marks and citations omitted).

### B. Alleged Violations

The Joint Brief divides the alleged violations into five categories: (1) misstatements and omissions concerning company assets; (2) misstatements and omissions concerning security/collateral; (3) misstatements and omissions concerning APB's and Urban Pharms's financial and business performance; (4) misstatements and omissions concerning General Clark's involvement with APB; and (5) misstatements and omissions concerning the use of investors' funds. *See generally* J. Br. The Court will address each of these allegations in turn.

As a preliminary matter, Defendants do not dispute that the liability of Lee, Rice, and Pallas is imputed to the Corporate Defendants APB, Urban Pharms, DJ&S, and TSL. *See* J. Br. at 29, n. 10; *In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 476 (9th Cir. 2015) ("[W]e have adopted the general rule of imputation and held that a corporation is responsible for a corporate officer's fraud committed 'within the scope of his employment' or 'for a misleading statement made by an employee or other agent who as actual or apparent authority.'") (citation omitted).

### 1.     Misstatements and Omissions Concerning Company Assets

First, Plaintiff argues that Defendants made misstatements and omissions concerning company assets. The undisputed facts show that Lee, Pallas, and Rice made several material misstatements concerning company assets, including the following:

- Lee, Rice, and Pallas communicated to investors that APB had assets in Puerto Rico and Colorado. JAF 248-251, 253-254, 315-317, 378-381. APB has never operated nor obtained ownership interest in a cannabis-related business in Puerto Rico or Colorado. JAF 142-143, 177-178, 180-181.

- Lee and Rice communicated to investors that APB was a "multi-state operator" and "vertically integrated." JAF 253, 321. APB's sole marijuana business consisted of the Oregon operations and APB has never operated a dispensary. JAF 12, 13.

- Lee and Pallas communicated to investors that APB had cannabis-related licenses in California and Puerto Rico. JAF 316-317, 323-324, 378, 381. APB did not have any licenses in California and Puerto Rico. JAF 142-143, 145, 197.

- Lee and Rice communicated to investors that APB owned a second cannabis farm in Oregon known as Sunfire Farms. JAF 250, 253, 318. APB never closed on the Sunfire Farms acquisition. JAF 190.[4]

These misstatements and omissions created a false impression that the company was much larger than it actually was. Defendants do not dispute that APB not possessing assets, or even licenses to operate, in these additional locations is material. *See, e.g., SEC v. AirTrac*, 2008 WL 11334597, at *7 (C.D. Cal. Jan. 2, 2008) ("There is no serious dispute that a reasonable investor would not have found information about upcoming public offerings, or contracts with major telecommunications carriers, material in deciding to invest with [Defendant].").

---

[4] Defendants indicate they dispute JAF 190, however, Defendants provide no evidence or argument in support of their position. *See* JAF 190.

Rice disputes that he made any material misstatements regarding APB's assets to any investor or prospective investor.[5] J. Br. at 42. However, it is undisputed that Rice was responsible for the investor pitch decks, "drove the creation" of the November 26, 2017 pitch deck, and instructed Robert Mayer to email a pitch deck that contained false information to investors. JAF 242, 248, 253. Additionally, Rice was included on multiple emails to investors containing misleading pitch decks and personally disseminated pitch decks to investors. JAF 248-251.

Defendants also challenge that they acted with scienter regarding these misstatements and omissions. Lee was the CEO of APB and Pallas was the CFO of APB. Although the parties dispute what Rice's job title was at APB, his job responsibilities included preparing pitch decks to present to investors. JAF 248, 253. Defendants knew that APB never acquired an interest in the Puerto Rico company. JAF 145-150. Defendants argue that they "believed that because APB had written agreements to acquire a controlling interest in Puerto Rico…that APB could claim ownership of those assets." J. Br. at 44-45. However, Lee could not have thought APB could own the Puerto Rico company as he was working with counsel in Puerto Rico "*because the law did not allow an American company to own a Puerto Rico company.*" J. Br. at 45; JAF 145-146. Moreover, John Randolph's email to Lee expressing concerns about representations in the Stonecrest Offering Slide Deck further supports Lee's scienter. JAF 382, 383. In this email Randolph stated: "I do not see evidence that APB does currently own any percentage of PR1. Can we clear this up? Make it official in some way that matches the representations made to the investors? …. Important: The Investor Deck talks a lot about Puerto Rico." *Id.*; *see also* JAF 254.  As in *Platforms Wireless*, 617 F.3d at 1095, the representations were "an absolute and unequivocal falsehood" about an asset the company did not own.

With respect to the California licenses, Lee and Pallas claim that Element Seven Company fraudulently told them that the licenses were received. J. Br. 45; Lee Decl., Dkt. No. 115-7, ¶ 5. However, Defendants provide no facts or evidence

---

[5] Defendants also claim that Rice had no knowledge about these matters. *See* J. Br. at 42-44. However, it is undisputed that Rice knew that there were "significant issues related to Puerto Rican law," that APB would complete the PR1 acquisition when the required capital had been injected and that not all the required capital had been injected, and that APB did not have any ownership interest in PR1 as of September 2018. JAF 147-149.

in support of this assertion. Furthermore, even if Defendants "based these statements on representations by [a third party]" there is no evidence that they "conducted [any] meaningful independent investigation to confirm the truth of their representations" which supports an inference that Defendants were consciously aware that they lacked a sufficient basis for their statements. *Gebhart*, 595 F.3d at 1044.

Overall, Defendants —at least, recklessly—made material misstatements concerning company assets.

### 2. Misstatements and Omissions Concerning Security and Collateral

Second, Plaintiff argues that Defendants made misstatements and omissions concerning security and collateral.[6]

For the Stonecrest Offering, Lee and APB told investors that they would obtain a first deed of trust and a senior secured lien on the membership interests of Urban Pharms and DJ&S. JAF 326-329. Investors did not receive either. JAF 333-334. Similarly, for the $5 Million Raise, Lee, Pallas, and APB advertised to investors a "guaranteed" loan with "SECURITY of a 1st trust deed[.]" JAF 395. In the promotional video for the $5 Million Raise, Lee says:

> It's just like a mortgage on your home or your real estate. We're giving a first trust deed for security, your collateral, on this farm. It's a very low loan to value ratio. So the safety of the, I'll call it the investment, or the loan is certainly there… If you're investing $100,000 the investment goes into an escrow account, and then once the trust deed, the security is delivered, then the money flows to the company. So the investor has that absolute confidence and peace of mind that it's a collateralized, protected investment. So we are pledging our most precious asset, this farm, as collateral. JAF 395.

However, investors in the $5 Million Raise never received a first deed of trust. JAF 397. In fact, no deed of trust at all has been recorded in favor of APB or any investor in the $5 Million Raise. *Id.* Despite materials stating that APB was to issue a two-year note and pay investors the 10% return on a quarterly basis, JAF 359, the

---

[6] Plaintiff does not allege Rice made misstatements and omissions concerning security and collateral.

documents executed by investors in the $5 Million Raise do not include any note evidencing APB's repayment obligation nor have any notes been produced in this litigation. JAF 360-361. Furthermore, the escrow funds were released to APB.[7] JAF 376.

Plaintiff asserts, and Defendants do not dispute, that these misstatements regarding security and collateral are material as a matter of law. The Court agrees. A reasonable investor would have obviously considered important that they would not receive the type of security and collateral for their investments that were promised to them. *See, e.g., SEC v. Loomis*, 969 F. Supp. 2d 1226, 1234 (E.D. Cal. 2013) (finding that "statements that the loans were secured by second mortgages were material").

Lee's knowing misrepresentations establish scienter. JAF 332, 336, 400, 402, 376. Lee argues that he did not act with scienter regarding the Stonecrest offering because he "believed that the investors would receive a first deed of trust" and "relied on the statements in the Stonecrest PPM that was prepared by the offeror." J. Br. at 50. He provides no evidence to support this claim. Furthermore, even if Lee "based these statements on representations by [Stonecrest PPM]" he "conducted no meaningful independent investigation to confirm the truth of their representations." *Gebhart*, 595 F.3d at 1044.

Regarding the $5 Million Raise, Lee argues that he did not act with scienter because he "based his statement that the investors would receive a first deed of trust on his understanding that Knighted had agreed to permit the investors to share Knighted's interest in the Farm." J. Br. at 50; JAF 399. Additionally, Pallas argues that he "believed the investors had obtained a first deed of trust because ABP RE Holdings had that position through its financial participation in Knighted facility and security interest." J. Br. at 50; JAF 400. However, it is undisputed that both Lee and Pallas knew that Knighted had the first deed of trust of the Oregon Farm. JAF 389-400. Lee and Pallas both signed an "Agreement Among Lenders" which stated that APB RE Holdings will not "exercise or seek to exercise any rights or remedies with respect to any Collateral" until Knighted is paid in full and will not "contest, protest, or object to any Exercise of Remedies" by Knighted. JAF 402. Even if Knighted were to somehow share its first deed of trust with investors, Lee and Pallas began promising this deed to investors in 2021, *before* the 2022

---

[7] Defendants clarify that the Escrow Agent, not AFB, released the escrow funds to AFB. Plaintiff agrees with Defendants' clarification. *See* JAF 376.

agreement with Knighted was signed. JAF 353, 402. "The undisputed facts in this case demonstrate that each [Defendant] either knew or was reckless in not knowing, that these securities were not backed by the collateral they had promised their investors, and therefore acted with the requisite scienter for fraud." *SEC v. Radical Bunny LLC*, 532 F. App'x 775, 777 (9th Cir. 2013) (internal quotations and citation omitted). These facts establish scienter for Lee and Pallas that the first deed of trust was not available for investors.

Accordingly, Lee and Pallas acted at least recklessly in making misstatements and omissions concerning security and collateral.

### 3. Misstatements and Omissions Concerning APB And Urban Pharms's Financial and Business Performance

Third, Plaintiff argues that Defendants made misstatements and omissions concerning APB and Urban Pharms's financial and business performance.

Lee and Pallas made misstatements and omissions during various investment offerings.[8] For example, Urban Pharms had a revenue of $942,7221 in 2022, with an EBITDA loss of $2,531,353. JAF 82. However, an Urban Pharms Financial Statement that was distributed to investors shows that Urban Pharms had revenue of $10.1 million and income from operations of $6.3 million for calendar year 2022. JAF 476. Defendants dispute this fact and claim that the exhibit is "incorrect" and that APB's Controller, Lee Patin, corrects it. *Id.* However, Defendants cite only to Patin's deposition in which Patin admits that the information included in the financial statement is false because Patin "recorded the income in the revenue, and then later backed it out and put it into other income." JAE 0514, 10/23/24 Patin Tr. 98:1-2. Defendants do not provide evidence that the false and misleading financial statement that was circulated to investors was corrected. In fact, Patin testified that she did not reach out to the investor who received the financial statements to tell him that the information was false. *Id.* at 101:3-6. Accordingly, the Court finds no genuine dispute of material fact here.

Additionally, the investment summary for the $5 Million Raise stated that APB's "CURRENT BALANCE SHEET & PROFITABLE INCOME STATEMENT AVAILABLE FOR REVIEW UPON REQUEST[.]" JAF 404. However, APB was not profitable—the company had net losses every year from

---

[8] The Court declines to resolve issues regarding Rice in this section.

2016 to 2023 that totaled over $50 million. JAF 80. Lee and Pallas in their roles understood APB's financial status, as evidenced by Pallas' letter regarding APB's "financial challenges," JAF 107, and APB's failure to make payroll that required Lee's mother to extend loans. JAF 127-129. Lee, Pallas, and APB did not tell investors that APB had suffered these loses. JAF 405.

      Misleading information relating to the profitability of APB is undoubtedly material to investors. "The misstatements and omissions created the false impression that [Defendant] was profitable, an impression that would have assumed significance in the deliberations of any reasonable investor." *SEC v. Glob. Express Cap. Real Est. Inv. Fund, I, LLC*, 289 F. App'x 183, 187 (9th Cir. 2008); *see SEC v. Murphy*, 626 F.2d 633, 653 (9th Cir. 1980) ("Surely the materiality of information relating to financial condition, solvency and profitability is not subject to serious challenge.").

      Lee and Pallas argue there is a dispute as to whether they acted with scienter. Defendants argue that, regarding the "Profitable Income Statements" referred to in the $5 Million Raise, "neither Lee nor [Pallas] know why this statement is on the document or who wrote it." Pallas Decl., Dkt. No. 115-7, ¶ 3; J. Br. at 55. Even if Lee and Pallas did not know who included this statement on the investment summary, they knew that the financial statement would be sent to investors, JAF 478, and that the statement falsely portrayed to investors that the company was profitable when it was not. *See, e.g., SEC v. LFS Funding Ltd. P'ship*, 2023 WL 6373859, at *8 (C.D. Cal. Aug. 25, 2023) ("[T]o the extent Defendant argues that he was ignorant of these false statements, distributing materials regarding the [] securities offering without knowing the contents of the materials is evidence of reckless conduct in itself").

      At a minimum, Lee and Pallas acted recklessly in making material misstatements concerning APB and Urban Pharms's financial and business performance.

### 4. Misstatements and Omissions Concerning General Clark's Involvement with APB

Next, Plaintiff alleges that Lee and Rice made false statements regarding General Clark's involvement to investors.[9] General Clark was a previous board member of APB's predecessor, the Grilled Cheese Truck, Inc., but resigned in April 2016 when the company shifted its focus because he did not want to "get painted with the cannabis brush." JAF 280. In 2018, Lee gave presentations to investors that claimed General Clark was part of "APB Leadership" as its "Chief Humanitarian and Global Economic Advisor." JAF 274-277. Rice also sent and was copied on emails containing pitch decks that listed General Clark as part of APB's "Executive Team." JAF 276-278.[10]

Defendants purport to dispute that after his resignation in April 2016, General Clark was not involved with APB and not part of its "Leadership" or "Executive Team," nor was an "Advisor" or "Chief Humanitarian and Global Economic Advisor." JAF 281. Defendants argue that General Clark "continued to consult" with Lee regarding APB. *See id.* However, the consultations Lee refers to concern "getting aid to Puerto Rico after the Maria Hurricane" and "political situations in Latin America," none of which purport to concern APB. Lee Decl., ¶ 3.

Considering General Clark's background and reputation, his leadership position was obviously important to a reasonable investor. *See SEC v. Husain*, 2017 WL 810269, at *8 (C.D. Cal. Mar. 1, 2017) ("Other than a corporation's financials, its leadership, the nature of its operations, and its plan for the future

---

[9] Plaintiff does not allege Pallas made misstatements and omissions concerning General Clark's involvement with APB.

[10] Rice disputes that he disseminated pitch decks to investors because the email he sent to Zubin Mehta was not "to solicit him as an investor." Rice Decl., Dkt. No. 115-7, ¶ 14.  The Court agrees with Plaintiff that Rice's claim that he thought Mehta was a marketer, not an investor, "does not create a dispute as to whether Rice disseminated misrepresentations in connection with an offer, purchase, or sale of a security."  Pl. Resp. to JAF 278 (citing JAE 1700).  Rice understood that Mehta was working with Carl Peterson, who was involved in raising money from investors, and he knew that the document would be used by Mehta to create a new pitch deck.  *Id.* (citing JAE 0418).

would seem to be *the most* important pieces of information available to an investor." (emphasis in original)).

Furthermore, Defendants do not dispute that "General Clark never would have agreed to have a management or advisory role with APB after APB became a cannabis company," that "APB did not have any written or oral agreements with General Clark after General Clark's resignation in April 2016," and that Rice received an email from General Clark in December 2017 stating: "Bernie, please correct this the right way. I'm not on the board, nor am I [an] advisor." JAF 282-285. Despite knowing these facts, Lee and Rice continued to make misrepresentations regarding General Clark's involvement after his 2016 resignation and 2017 email. *See* JAF 274-279.

Accordingly, Lee and Rice, at least recklessly, made false material statements to investors concerning General Clark's involvement with APB.

### 5. Misstatements and Omissions Concerning the Use of Investors' Funds

Finally, Plaintiff argues that Defendants made misstatements and omissions concerning use of investors' funds.[11]

Plaintiff first argues that Lee and Pallas made a material misstatement by circulating to investors that the Garden Unit Offering was "for expansion purposes only" and that $10 million already had been raised "for expansion purposes." J. Br. at 59; JAF 490. Defendants argue that the circulated memorandum does not say "only." However, the exhibit that both parties cite to clearly states: "This Syndication is for expansion purposes *only*" and that "[i]n 2022 $10M was successfully raised for expansion purposes[.]" JAE 0761, Ex. 15 at L&A 018674 (emphasis added). Additionally, it is undisputed that Lee knew that not all money raised in the Garden Unit Offering was used for expansion, as he remarked in a communication with an investor that APB planned to sell each garden interest for $7.5 million, even though it only costs approximately $1.5 million to develop an outdoor garden. JAF 492-493. Regardless of whether *some* of the money went to the garden expansion, these misstatements are material when Lee knew the vast majority of money raised for the purpose of expansion was actually to be used for

---

[11] Plaintiff does not allege Rice made misstatements and omissions concerning the use of investors' funds.

different purposes. *See, e.g., SEC v. Skinner*, 2022 WL 2784811, at *5 (C.D. Cal. June 17, 2022) ("Any reasonable investor would clearly have considered it important to know that their funds were being used to pay [Defendant]'s personal expenses, other investors, or unrelated business expenses, instead of funding for the intended real estate projects."); *SEC v. Cap. Cove Bancorp LLC*, 2015 WL 9704076, at *7 (C.D. Cal. Sept. 1, 2015) ("Committing to invest Fund proceeds in real estate while channeling those investments to either personal use or Ponzi-like payments is clearly a material representation."). Defendants do not dispute that Lee and Pallas acted with scienter in connection with these misstatements as the CEO and COO of the company at the time.

Additionally, APB paid for Lee's multiple condominiums in Puerto Rico, a personal cook, and a cleaner. JAF 62-64. APB also paid hundreds of thousands of dollars for hotels, travel, spa visits, clothing stores, and more for Lee, his girlfriend, and her family. JAF 74. Defendants provide no evidence that these purchases were disclosed to investors or that investors were told funds would be used for Lee's personal expenses. Rather, Defendants argue that "APB did not pay for a 'lavish lifestyle' for Lee but rather for necessary living and business operating expenses." J. Br. at 61. The Court finds no genuine dispute of material fact here regarding APB's payments as the payments themselves are undisputed. JAF 62-64, 74. Knowledge of these expenses would be important to investors, especially when the company was not profitable. *See, e.g., SEC v. Chen*, 2016 WL 7469683, at *9 (C.D. Cal. Dec. 8, 2016) ("Defendant used investor money to fund a lifestyle that included multiple million-dollar mansions and luxury automobiles for him and his family… Such misuse shows Defendant's intent to defraud investors for his personal gain."). Lee knew, or was at least reckless in not knowing, that funds were being misappropriated by being spent on his personal lifestyle.

Accordingly, Lee and Pallas acted at least recklessly in making misstatements and omissions concerning the use of investors' funds.

### C. Summary

In conclusion, the Court finds that Plaintiff met its initial burden "of identifying the elements of the claim . . . on which summary judgment is sought and evidence that it believes demonstrates the absence of an issue of material fact," with respect to its antifraud claims. *Celotex Corp.*, 477 U.S. at 323. Defendants have not met their shifted burden of "set[ting] forth specific facts showing that there is a genuine issue for trial," *Anderson*, 477 U.S. at 250. The Court thus

concludes that there is no genuine dispute of material fact as to Plaintiff's claims 1 and 2. The Court grants Plaintiff's Motion for Summary Judgment on the issue of liability for its Section 17(a), Section 10(b) and Rule 10b-5 claims against Lee, Rice, and Pallas, in addition to the Corporate Defendants. *See In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d at 476.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Partial Summary Judgment is GRANTED.

**IT IS SO ORDERED.**